*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 53**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner and Cross-Respondent,*

*v.*

YESHA ANTHONY GARCIA,
*Respondent and Cross-Petitioner.*

No. 20160451
Filed August 23, 2017

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Robin W. Reese
No. 101904923

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for petitioner

Teresa L. Welch, Salt Lake City, for respondent

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Yesha[1] Anthony Garcia fired four shots at a car driving past his house. The car's driver, Garcia's cousin Keith, was the intended

---

[1] The pleadings spell Mr. Garcia's first name as Yesha, but it appears that the correct spelling is Yshiah. For the sake of consistency, we maintain the spelling reflected in the district court and court of appeals records.

target. Keith's step-daughter Kanesha was also aboard when Garcia took aim. The State charged Garcia with attempted murder and possession of a firearm by a restricted person.[2]

¶2 At trial, Garcia presented evidence of an imperfect self-defense. The district court decided—and the State conceded—that sufficient evidence of imperfect self-defense existed to present the defense to a jury. The jury was also instructed on the lesser-included offense of attempted manslaughter. But the jury instruction explaining how imperfect self-defense interacted with attempted manslaughter misstated the law.[3] The jury convicted Garcia on the attempted murder and possession of a firearm by a restricted person charges.

¶3 Garcia argued to the Utah Court of Appeals that his counsel provided ineffective assistance when he failed to object to the attempted manslaughter jury instruction. Garcia also argued that the district court erred by not granting a directed verdict on the possession of a firearm charge because there was insufficient evidence to convict him. Garcia claimed that to the extent his insufficiency claim was unpreserved, his counsel provided ineffective assistance with respect to that claim. The court of appeals found that the defective jury instruction prejudiced Garcia's trial and vacated his attempted murder conviction. *State v. Garcia*, 2016 UT App 59, ¶ 26, 370 P.3d 970. The court of appeals affirmed the possession of a firearm by a restricted person charge, concluding that even if Garcia's counsel had erred, the error was not prejudicial. *Id.* ¶ 37.

¶4 The State seeks certiorari review of the court of appeals' ruling. The State argues that the court erred by presuming prejudice without considering whether, without counsel's error, "[t]he likelihood of a different result [was] substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Garcia cross-petitions and argues that the court of appeals erred when it

---

[2] The State also charged Garcia with attempted murder for shots fired at the car passenger, two counts of felony discharge of a firearm, and one count of possession of drug paraphernalia. These charges are not relevant to the issues on appeal.

[3] Garcia is represented by different counsel on appeal.

found that his counsel had not preserved his argument concerning the constitutionality of the unlawful user in possession statute. Garcia also claims that the court of appeals erred when it found that his counsel had not provided ineffective assistance when he neglected to argue that the term "unlawful user" was unconstitutionally vague as applied to him.

¶5 We reverse the court of appeals with respect to the jury instruction argument, but we uphold the denial of Garcia's motion for directed verdict.

## BACKGROUND

¶6 Yesha Anthony Garcia sold drugs professionally. Garcia believed his cousin Keith had stolen a portion of his cocaine stash that Garcia kept at his cousin Tish's apartment. This enraged Garcia. He beat up both Keith's wife and step-daughter, Kanesha. Garcia then called Keith's mom on the phone, telling her he was going to kill Keith.

¶7 That same evening, Garcia sent his live-in girlfriend to her family's home, and—loaded gun in hand—waited for Keith to appear. Eventually, Garcia saw Keith and Kanesha—who claim they were looking for Garcia's address to give to the police—drive past his house, turn around, and drive past again. Garcia ran out his front door and unloaded his revolver in the car's direction. Garcia failed to hit the car. Kanesha called the police.

¶8 A little while later, a police officer found Garcia walking in his neighborhood. At trial, the officer who made first contact with Garcia on the street testified about their encounter. The officer testified that he called over to Garcia, who walked toward the officer and—unprompted—put his hands on the hood of the police car. Garcia told the officer that his name was Chancey Garcia. When asked to spell Chancey, Garcia couldn't. When the officer asked him "how that was possible that a grown man didn't know how to spell his name," Garcia became defensive. The officer told Garcia that he was looking for someone who had committed a crime and that, if it wasn't him, he could be on his way. According to the officer, at that point, Garcia began looking from side to side in a way that, in the officer's opinion, seemed like Garcia was "looking for an escape route." After that, the officer ordered Garcia to sit down on the

ground. Garcia complied. Another officer approached with "the complainant," who identified Garcia as the shooter.[4]

¶9    After Garcia was identified, he was cuffed and placed in a police car. A detective who interviewed Garcia testified that Garcia told him where the gun Garcia had fired could be found. The detective also reported that Garcia insisted he "hadn't done anything wrong. He was just protecting himself and his family, that sort of thing."

¶10 Garcia spoke with a sergeant at the police station later that morning. In the interview, Garcia explained his frame of mind when Keith and Kanesha drove past his house:

> A: I don't know what the f*** [Keith]'s gonna do. I thought he was gonna throw a cocktail in my house.
>
> Q: A Molotov cocktail?
>
> A: Yeah. That's why I was there. If it wasn't for that I would've been in Wendover or something. I would try and let this shit die down.
>
> . . . .
>
> Q: Tish had said, yeah, he [Keith] came and got his gun, he's gonna light you up? Or what'd she say?
>
> A: Nah, I wasn't . . . thinking about him like hurting me, burning me like that.
>
> Q: But if Tish told you he had his gun . . . you knew that he was coming for you, possibly.
>
> A: Not really. Not in that kind of way because he's scary you know, I mean, I know his character.
>
> Q: So you didn't think he was gonna come? You just thought maybe?
>
> A: Yeah, I was like mainly worried about my property really.

---

[4] The record is not clear on whether the complainant was Keith or Kanesha.

¶11 Garcia also spoke about his motive for firing at Keith:

> [Keith] just pulled up in the Explorer, just like looking, like—mad dogging and shit. And I looked, and I was like no he didn't, no he didn't. And I just grabbed my shit like *boom boom boom boom*, and I emptied out the whole clip.
>
> . . . .
>
> I'm just glad I didn't hurt nobody, though. It was just like when I saw him I just like, because I wanted to kill him bad, I want him dead.
>
> . . . .
>
> I just lost it, man. Because I'm already done. Like, I was so antsy yesterday. I wanted to just kill him. I wanted to go just kill him.

¶12 At the station, Garcia also spoke about his drug dealing and his drug use:

> When I'm off cocaine, too, I get like real paranoid. I always think the cops gonna run in my shit. So, uh, yeah cuz I do a lot of cocaine like sometimes.
>
> . . . .
>
> Q: [I]t's odd that you use, because lots of people who really got skills don't use at all.
>
> A: Yeah, no, it's just my heart and soul is into this shit man, you know what I mean?
>
> . . . .
>
> A: I started using in 2006. I was twenty-five about to turn twenty-six.

¶13 At trial, Garcia told a somewhat different story. He testified that he believed Keith had stolen drugs from him and that he had merely taken "precautions to protect [his] home from an attack from Keith." He also testified that he expected Keith to come over to his house "with a gun"—but never mentioned a Molotov cocktail. He said he sent his girlfriend away because he "didn't feel safe." When his counsel asked why he didn't feel safe, he stated, "I just know my cousin."

> Q: What does that mean?
>
> A: He just blows stuff out of proportion. Just like one minute he is cool with us, and then he just snaps.

Q: Okay. Does Keith have a history of violence?

A: Yeah.

Q: Okay. And you believed him to possess a firearm?

A: Yeah.

. . . .

Q: Okay. And . . . what was your understanding of what he was going to do with that gun?

A: He was coming for me. Like he was coming to look for me.

Q: Okay. And so you felt there was a danger?

A: Yes.

. . . .

Q: And you told [the detectives] Keith was coming for [you], and you did what?

A: I defended myself.

¶14  After Garcia was questioned by his counsel, the prosecutor cross-examined him.

Q: [Y]ou just testified that you were afraid Keith was coming at you with a gun?

A: Yes.

Q: And you just testified that Keith—you had been told Keith was going to come get you with a gun?

A: Yes.

Q: All right. Now, you, um, talked to this detective, right?

A: Yes.

Q: You watched the videotape of that interview?

A: Yes.

. . . .

Q: [T]he detective asked you, um, says, Hey, you thought that Keith was coming for you with a gun? And you said, Not in that way. I know his character. Um, I was more worried about my property.

¶15 The sergeant later testified that in his interview with Garcia, Garcia never mentioned that he was afraid Keith was coming at him with a gun.

¶16 After the close of evidence, Garcia argued that there was an evidentiary basis to instruct the jury on attempted manslaughter "if you look at his actions as reckless." The State countered that there was no evidence that Garcia shot at Keith recklessly. But it suggested that "there is some evidence upon which . . . [Garcia] could argue that it was imperfect self-defense," because Garcia could have believed, even though "[Keith] wasn't armed, . . . [that] he thought [Keith] was coming at him with a gun." The State explained that even though it thought the theory was "wrong," there was enough evidence that "the instruction should come in."

¶17 In response to the State's comments, Garcia offered to modify the attempted manslaughter jury instruction to reflect imperfect self-defense. The district court agreed to let Garcia put the imperfect self-defense attempted manslaughter instruction before the jury.

¶18 Garcia also moved the district court to direct a verdict on the State's charge of possession of a firearm by a restricted person—in Garcia's case, an "unlawful user." *See* UTAH CODE § 76-10-503(1)(b)(iii). Garcia took issue with the phrase "unlawful user," asking the court to narrowly define the phrase because the statute offered no definition. He argued that the phrase must describe "a current user, not someone who's used drugs in the past, but they are actually currently using drugs." Garcia also argued that under this narrow definition, there was insufficient evidence to convict and that a directed verdict was appropriate.

¶19 The State responded that there was sufficient evidence to defeat Garcia's directed verdict motion because Garcia "describes himself as a drug dealer and a drug user." Garcia reasoned that the evidence of being a drug dealer was insufficient because the statute employs the term "user" not "dealer" and because a "user" is defined as someone who currently has drugs "in your system." Under that definition, Garcia maintained, there was insufficient evidence to prove that he was a user of drugs.

¶20 The court denied the directed verdict motion and allowed the question of whether Garcia was an unlawful user in possession of a firearm to go to the jury:

> I don't see anything in the statute that would require proof that he had some measurable amount of substance in his system . . . . It's at least a jury question as to whether he is a user or not a user, and the jury will just have to apply their own definition of the word "user." If they have a question about it, we will use a dictionary and we will let them go from there.

¶21 When the jury began deliberations, it had before it five charges to consider: two charges of attempted murder—one charge each for Keith and Kanesha; possession of a firearm as an unlawful user of a controlled substance; and two counts of discharge of a firearm. The jury was instructed as to the elements of each alleged crime. Relevant to this case, the jury was also instructed on the lesser-included offense of attempted manslaughter.

¶22 The attempted murder jury instruction explained that, in order to convict Garcia of attempted murder as charged in count I, "which is alleged to have occurred on or about the 30th day of June, 2010, in Salt Lake County, State of Utah," the jury "must find from all of the evidence and beyond a reasonable doubt":

> 1. That the defendant, Yesha Anthony Garcia,
>
> 2. Intentionally,
>
> 3. Attempted to cause the death of Keith.

A similar instruction replaced Keith with Kanesha.

¶23 The attempted manslaughter instruction explained that, in order to convict Garcia of attempted manslaughter, the jury "must find beyond a reasonable doubt":

> 1. That on or about June 30, 2010;
>
> 2. In Salt Lake County, State of Utah;
>
> 3. The Defendant, Yesha Anthony Garcia;
>
> 4. Attempted to cause the death of Keith . . . ; and

    5. The affirmative defense of imperfect self-defense does not apply.[5]

A similar instruction replaced the name of Keith with Kanesha.

¶24 Another jury instruction explained that in order to convict Garcia of possession of a firearm by a restricted person, the jury must find beyond a reasonable doubt that Garcia had "possessed, used, or had under his custody or control a firearm; and . . . [w]as at the time a category II restricted person." Subsequent jury instructions defined a category II restricted person as "a person who . . . [i]s an unlawful user of a controlled substance" and defined cocaine as a controlled substance. Garcia never asked for a jury instruction containing the narrower reading of the statutory language that he advocated for when seeking a directed verdict.

¶25 The jury found Garcia guilty of one count of attempted murder, one count of possession of a firearm by a restricted person, and two counts of felony discharge of a firearm. The jury acquitted him of the second count of attempted murder as to Kanesha.

¶26 Garcia appealed his convictions to the Utah Court of Appeals. *State v. Garcia*, 2016 UT App 59, 370 P.3d 970. He argued, among other things, that his trial counsel provided ineffective assistance "for failing to object to a jury instruction 'that told the jury to convict [Garcia] of lesser-included attempted manslaughter only if imperfect self-defense does not apply.'" *Id.* ¶ 8 (alteration in original). He also argued that the evidence was insufficient to convict him of possession of a firearm by a restricted person, because "the only evidence supporting [Garcia]'s status as an 'unlawful user' of cocaine was his uncorroborated out-of-court admission to [the sergeant] that he 'sometimes' did 'a lot of cocaine.'"

¶27 Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), to prevail on an ineffective assistance of counsel claim, trial counsel must have (1) performed deficiently and (2) prejudiced defendant with her deficient performance. The court of appeals held that Garcia's trial counsel performed deficiently when he submitted a

---

[5] A correct instruction would have informed the jury that if Garcia acted in imperfect self-defense, he could be convicted of attempted manslaughter. If the jury were to find that imperfect self-defense did not apply, Garcia could be guilty of attempted murder.

jury instruction that "failed to set forth the actual elements the jury needed to find in order to convict Garcia of attempted manslaughter" instead of attempted murder. *Garcia*, 2016 UT App 59, ¶ 21.

¶28 *Strickland*'s prejudice prong requires a court to "consider the totality of the evidence before the judge or jury" and then "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 695–96. The court of appeals cited a Utah case, which states that failure to give "an accurate instruction upon the basic elements of an offense . . . . can never be harmless error." *Garcia*, 2016 UT App 59, ¶ 23 (quoting *State v. Bluff*, 2002 UT 66, ¶ 26, 52 P.3d 1210). The court also found that "because there was a reasonable basis for the jury to conclude that imperfect self-defense applied, there is necessarily 'a reasonable probability . . . that, but for counsel's error, the result would have been different.'" *Id.* ¶ 25 (alteration in original) (citation omitted). It therefore determined that Garcia's trial counsel's ineffective assistance had prejudiced Garcia's defense. *Id.* ¶ 26.

¶29 The court of appeals held that Garcia's second argument—that the phrase "unlawful user" was unconstitutionally vague—was unpreserved. *Id.* ¶ 34. It then considered whether the failure to raise the argument below constituted ineffective assistance of counsel. *Id.* The court of appeals concluded that even if Garcia's counsel had provided ineffective assistance, Garcia did not suffer prejudice. *Id.* ¶ 38. It reasoned that Garcia could provide no authority for his proposed definition of unlawful user and that even if the court were to define the term the way federal courts have interpreted similar language to assuage vagueness concerns, sufficient evidence existed to convict Garcia. *Id.*; *see United States v. Patterson*, 431 F.3d 832, 838–39 (5th Cir. 2005) (requiring evidence of (1) regularity of drug use and (2) temporal proximity between the drug use and the firearm possession). Specifically, the court commented that Garcia's confession that "I [present-tense] *do* a lot of cocaine like *sometimes*" and his "admissions that he was a user in context as to why he had the gun nearby" provided ample evidence to defeat a directed verdict motion. *Garcia*, 2016 UT App 59, ¶ 38.

¶30 On certiorari, the State claims the court of appeals erred by finding that trial counsel's defective jury instruction prejudiced Garcia. And Garcia claims the court of appeals erred when it "failed

to properly apply the applicable statutory phrase 'unlawful user' in a constitutional manner that comports with its plain meaning."

¶31 We have jurisdiction under Utah Code section 78A-3-102(3)(a). We reverse the court of appeals with respect to the jury instruction argument, but we uphold the denial of Garcia's motion for directed verdict.

## ISSUES AND STANDARDS OF REVIEW

¶32 The State first asks us to review the Utah Court of Appeals' decision that an error in Garcia's jury instruction explaining the lesser-included offense of attempted manslaughter was prejudicial. "On certiorari, we review the decision of the court of appeals for correctness, without deference to its conclusions of law." *State v. Smith*, 2014 UT 33, ¶ 9, 344 P.3d 573 (citation omitted).

¶33 Garcia cross-petitions for certiorari. He asks us to review the court of appeals' decision affirming the district court's dismissal of his motion for a directed verdict on his charge for "unlawful user" in possession of a firearm. We review the court of appeals' decision to uphold the district court's denial of a motion for a directed verdict for correctness. *See Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶¶ 10–11, 48 P.3d 968. And we review "the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict." *Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d 933 (citation omitted).

## ANALYSIS

### I. Garcia Was Not Prejudiced by His Counsel's Ineffective Assistance

¶34 The State argues that the Utah Court of Appeals got it wrong when it concluded that trial counsel's assent to an erroneous jury instruction prejudiced Garcia. The State assails the court of appeals' reliance on *State v. Bluff*, which states that errors in elements instructions are never harmless. 2002 UT 66, ¶ 26, 52 P.3d 1210 *abrogated on other grounds by Met v. State*, 2016 UT 51, 388 P.3d 447. It also takes issue with the court's alternative grounds for reversal: that because the parties agreed that "there was a reasonable basis for the jury to conclude that imperfect self-defense applied"—which is the standard for placing an instruction before a jury—"there is necessarily 'a reasonable probability . . . that, but for counsel's error, the result would have been different." *State v. Garcia*, 2016 UT App

59, ¶ 25, 370 P.3d 970 (alteration in original) (citation omitted). We conclude that trial counsel's mistake did not prejudice Garcia's defense.

¶35 The Sixth Amendment to the United States Constitution guarantees the accused the "Assistance of Counsel for his defence." The United States Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted). In *Strickland*, the Court "articulated what has been referred to as both the 'well-worn' and now 'famous' two-prong test used by courts when reviewing Sixth Amendment claims of ineffective assistance of counsel." Todd A. Berger, *The Constitutional Limits of Client-Centered Decision Making*, 50 U. RICH. L. REV. 1089, 1120 (2016) (citations omitted). That test requires "(1) attorney error . . . and (2) prejudice . . . flowing from that error."[6] *Id.* Thus, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. In other words, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692; *id.* at 687 ("A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction," requires the defendant to "show that the deficient performance prejudiced the defense.").

¶36 The *Strickland* Court explained that, "[c]onflict of interest claims aside," all other claims alleging counsel's defective performance "are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693. The Court has even been hesitant to forgo the prejudice analysis where the ineffective assistance resulted in a "structural error"—an error where, if an objection is made at trial, "the defendant generally is entitled to 'automatic reversal.'" *See, e.g.*, *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *Neder v. United States,* 527 U.S. 1, 7 (1999)). In *Weaver*, the Supreme Court held that although a violation of the defendant's right to a public trial is a structural error, where the

---

[6] The State does not contest the court of appeals' conclusion that Garcia's counsel provided ineffective assistance with respect to the jury instruction.

unpreserved issue was raised as ineffective assistance of counsel, *Strickland* prejudice is not shown automatically. *Id.* Rather, "the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id.* at 1911.

¶37 The *Strickland* Court explained why most ineffective assistance of counsel claims are subject to a prejudice analysis:

> Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, defendant must show that they actually had an adverse effect on the defense.

466 U.S. at 693. Thus, under *Strickland*, it is the defendant's burden to show that he was prejudiced by his counsel's performance.

¶38 The State argues that the court of appeals erred by presuming prejudice. The court of appeals never explicitly stated that it could presume prejudice where the court erroneously instructed the jury. Indeed, it recognized that *Strickland* required examination into whether "but for counsel's error, the result would have been different." *Garcia,* 2016 UT App 59, ¶ 22 (quoting *Strickland,* 466 U.S. at 694). But the two analyses the court of appeals employed to assess prejudice have the look and feel of presuming, rather than finding, prejudice.

¶39 First, the court of appeals—relying on *State v. Bluff*—stated

> The Utah Supreme Court has recognized that "an accurate instruction upon the basic elements of an offense is essential. Failure to so instruct constitutes reversible error. Thus, the failure to give this [accurate] instruction can never be harmless error."

*Garcia*, 2016 UT App 59, ¶ 23 (alteration in original) (quoting *Bluff,* 2002 UT 66, ¶ 26). The court of appeals' reliance on *Bluff* is misplaced. In *Bluff,* the defendant argued that the district court failed

to include an element of felony murder in its jury instructions. 2002 UT 66, ¶ 24. The issue was not preserved at trial, so the defendant argued that both plain error and ineffective assistance of counsel allowed this court to reach the district court's alleged error. *Id.* We resolved *Bluff* by finding that any error, if there were error, was far from plain and counsel did not provide ineffective assistance by failing to request the augmented instruction. *Id.* ¶ 30. We did not need to determine whether the supposed error had prejudiced Bluff.

¶40 Moreover, any attempt to graft *Bluff's* holding into a Sixth Amendment ineffective assistance argument would conflict with federal precedent. *See State v. Sessions,* 2014 UT 44, ¶ 37, 342 P.3d 738 (The standard of proof for ineffective assistance of counsel claims "is a matter of federal law, on which we are bound to follow Supreme Court precedent."). Although the question arose outside the ineffective assistance context, in *Neder*, the United States Supreme Court held that errors in jury instructions—even instructions going to the elements of a charged crime—require harmless-error analysis. 527 U.S. at 15 (concluding "that the omission of an element is an error that is subject to harmless-error analysis"). The Court explained that jury instruction errors on the elements of a crime are often subject to "harmless-error analysis" because a single error does not "vitiate[] *all* the jury's findings" and therefore did not affect the entire framework of the trial's process. *Id.* at 9–11 (citation omitted). In light of *Neder* and *Weaver*, any reading of *Bluff* that suggests a defendant need not show she was prejudiced by an erroneous jury instruction resulting from her counsel's ineffective assistance would be inconsistent with federal precedent.

¶41 To the extent the court of appeals used our statement in *Bluff* as a stand-in for a prejudice analysis, as the State claims it did, that was error. It is not clear, however, that the court of appeals actually used *Bluff* that way. After it cited *Bluff,* the court examined the jury instructions and concluded that "the jury was caught in a Catch-22; in order to convict Garcia of the lesser offense, the jury had to find all the elements of the greater offense." *Garcia,* 2016 UT App 59, ¶ 24. This led the court of appeals to conclude that "there can be no confidence that the jury understood what impact a determination of imperfect self-defense should have had on the verdict." *Id.* Unlike the State, we do not read this as presuming prejudice. The court of appeals went beyond just acknowledging the existence of an erroneous instruction as it would if it were to presume prejudice. Instead, it analyzed how that instruction might have impacted

Garcia's trial and predicted juror behavior in response to the erroneous instruction. *Id.* However, the court of appeals stopped this analysis short, which prevented it from fully conducting the prejudice inquiry *Strickland* requires.

¶42  A proper analysis also needs to focus on the evidence before the jury and whether the jury could reasonably have found that Garcia acted in imperfect self-defense such that a failure to instruct the jury properly undermines confidence in the verdict. The *Strickland* Court explained, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. A court must "consider the totality of the evidence before the judge or jury" and then "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 695–96. Thus, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Ultimately, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The court of appeals did not engage in this analysis, instead concluding that because the instruction was erroneous, "there can be no confidence that the jury understood what impact a determination of imperfect self-defense should have had on the verdict." *Garcia,* 2016 UT App 59, ¶ 24.

¶43  The court of appeals' second analytical thrust focused on the State, defense counsel, and the district court concluding that there was sufficient evidence to warrant instructing the jury on imperfect self-defense. *Id.* ¶ 25. The court of appeals suggested that if there was sufficient evidence to provide the instruction, there was necessarily a reasonable probability of a different outcome:

> Odd though it may seem on this record, Trial Counsel, the State, and the trial court all agreed that Garcia was entitled to an instruction on imperfect self-defense. A defendant is entitled to an imperfect self-defense instruction if the evidence provides "[a] reasonable basis for the jury to conclude" that the defense applies. We will not now second-guess the assessment made by the parties and the trial court that the evidence here did so. And because there was a reasonable basis for the jury to conclude that imperfect self-defense applied, there is necessarily "a reasonable

probability . . . that, but for counsel's error, the result would have been different."

*Id.* (alterations in original) (citations omitted).

¶44 *Strickland's* requirement of a "reasonable probability" of a different outcome is a relatively high hurdle to overcome. *See Strickland*, 466 U.S. at 694. A reasonable probability of a different outcome is in no way synonymous with the lower bar a defendant must clear to instruct the jury on an imperfect self-defense: "any reasonable basis in the evidence." *State v. Torres*, 619 P.2d 694, 695 (Utah 1980) ("We are not concerned with the reasonableness, nor the credibility of the defendant's evidence relating to his claim of self-defense. Each party is, however, entitled to have the jury instructed on the law applicable to its theory of the case if there is any reasonable basis in the evidence to justify it."). Thus, the court of appeals erred when it equated these two standards and allowed the decision to issue the jury instruction to stand in for *Strickland* prejudice.

¶45 When we examine the record as a whole, counsel's error does not undermine our confidence in the jury's verdict finding Garcia guilty of attempted murder rather than attempted manslaughter. The evidence that Garcia was motivated by a desire to kill Keith overwhelmed the evidence that Garcia acted in imperfect self-defense.

¶46 In Garcia's statement to the police sergeant just hours after the shooting, Garcia emphasized that he "just lost it" and that he "wanted to just kill him":

> [Keith] just pulled up in the Explorer, just like looking, like—mad dogging and shit. And I looked, and I was like no he didn't, no he didn't. And I just grabbed my shit like *boom boom boom boom*, and I emptied out the whole clip.
>
> . . . .
>
> It was just like when I saw him I just like, because I wanted to kill him bad, I want him dead.
>
> . . . .
>
> I just lost it, man. . . . I wanted to just kill him. I wanted to go just kill him.

¶47 Garcia also told the sergeant that he had called Keith's mother the day before and told her that he was going to kill Keith. Garcia did testify at trial, during his counsel's direct examination,

that he was afraid that Keith was "coming for [him]" with a gun. But the jury also heard that immediately after the shooting, when specifically asked if he was afraid of Keith coming to get him with a gun, Garcia told the detective that he "wasn't . . . thinking about him like hurting me, burning me like that" but that he was "mainly worried about [his] property really." The evidence that Garcia pulled the trigger out of a desire to kill Keith overpowers any evidence that he acted on a reasonable but erroneous belief that he was defending himself. Looking at all the evidence in front of the jury, much of it from Garcia's own mouth, our confidence in the jury's verdict is not undermined.

¶48  In sum, the court of appeals erred when it failed to conduct the prejudice analysis *Strickland* requires. Under that analysis, Garcia has not shown a reasonable probability of a different outcome at trial sufficient to undermine our confidence in the jury's verdict. The court of appeals erred when it determined that Garcia was prejudiced by the ineffective assistance of counsel he received with regard to the erroneous jury instruction on a lesser-included offense.

## II. The District Court's Denial of the Motion for Directed Verdict Did Not Prejudice Garcia

¶49  Garcia cross-petitions for certiorari, asking this court to review the court of appeals' decision to affirm the trial court's dismissal of his motion for directed verdict on the charge of being an "unlawful user" in possession of a firearm. The court of appeals found this issue to be unpreserved and reviewed it for ineffective assistance of counsel. *State v. Garcia*, 2016 UT App 59, ¶ 34, 370 P.3d 970. The court of appeals concluded that Garcia had failed to demonstrate that any error his counsel may have made prejudiced him. *Id.* ¶ 35. Garcia first argues that the court of appeals erred in finding that his counsel failed to preserve the issue before the district court.

¶50  To preserve an issue for appeal, the issue must typically be presented to the district court in a manner that would permit the district court to address it. *See Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968. "Issues that are not raised at trial are usually deemed waived." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801. The court of appeals correctly observed that

Garcia "did not raise a constitutional argument at trial." *Garcia*, 2016 UT App 59, ¶ 34.[7] Garcia did, however, place before the district court the question of how the phrase "unlawful user" should be interpreted. Garcia contends that by arguing about the proper construction of the statute before the district court, he preserved the ability to argue on appeal that the statute should be construed in a manner that preserves its constitutionality. Thus, the question before us is whether failure to argue a specific canon of construction before the district court means that canon is unavailable on appeal.

¶51 In *Bagley v. Bagley*, we tackled this question. There, we reasoned that

> While Plaintiff correctly observes that Defendant did not specifically raise an absurd results argument below, this is ultimately immaterial for one simple reason: Defendant's absurd result argument does not raise a wholly new issue. Instead, she offers an argument in support of a particular issue already preserved on appeal. As noted above, the issue on appeal is whether the wrongful death and survival action statutes allow an heir or personal representative to stand in the shoes of a tortfeasor defendant. Where the best reading of these statutes is directly before us on appeal, an absurdity analysis is an integral extension of our interpretive task. Our failure to entertain Defendant's absurdity argument may lead us to misconstrue both statutes. Accordingly, we reach this argument to fully address the issue on appeal.

---

[7] Before the court of appeals, Garcia argued that "unlawful user" was subject to a number of different interpretations. He further argued that "[a] broad construction of 'unlawful user'" raised constitutional vagueness concerns. He pressed for an interpretation that would ameliorate the potential constitutional issue. The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them*." *Clark v. Martinez*, 543 U.S. 371, 385 (2005).

2016 UT 48, ¶ 26, 387 P.3d 1000 (footnotes omitted); *see also Richardson v. Fiedler Roofing, Inc.*, 493 N.E.2d 228, 230 (N.Y. 1986) ("The argument raises solely a question of statutory interpretation . . . which we may address even though it was not presented below."). Our decision in *Bagley* reflects a distinction we have made and repeated: "*Issues* must be preserved, not arguments for or against a particular ruling on an issue raised below." *Gressman v. State*, 2013 UT 63, ¶ 45, 323 P.3d 998. Thus, where an issue is preserved for our consideration, we will not limit the interpretive canons a party may argue as a means of persuading this court to reach the correct result. *See also State v. Shepherd*, 236 P.3d 738, 741 (Or. Ct. App. 2010) ("We understand that . . . we are 'responsible for identifying the correct interpretation [of a statute], whether or not asserted by the parties.' That responsibility arises, however, only when the parties have put the issue of statutory interpretation before us by disagreeing as to what a statute means . . . ." (second alteration in original) (citation omitted)).

¶52 Here, Garcia presented the question of how the statute should be interpreted to the district court, and the district court ruled on it. Garcia moved the court for a directed verdict on the restricted person in possession charge, arguing that under a narrow interpretation of the phrase "unlawful user," there was insufficient evidence to find him guilty. Garcia's failure to invoke the constitutional avoidance canon does not deprive us of the ability to employ that canon to interpret the statute. Garcia preserved the statutory interpretation and insufficient evidence issues at the district court and on appeal and, thus, both are fair game on certiorari. The court of appeals erred by finding the issue unpreserved and reviewing the question through the lens of ineffective assistance of counsel.

¶53 Instead of reviewing the court of appeals' ineffective assistance of counsel analysis, we will address the underlying question of whether the district court erred in denying Garcia's motion for directed verdict. We recognize that this is not the question the court of appeals answered, and, thus, we have no appellate court opinion to review. Although we could remand for further consideration of the question, in this instance, we are well-positioned to consider the issue because the matter is fully briefed and squarely before us.

¶54 The State charged Garcia with one count of possession of a firearm by a restricted person—i.e., "an unlawful user of a controlled

substance." UTAH CODE §§ 76-10-503(1)(b)(iii), 58-37-2(1)(ii), 58-37-4(2)(b)(i)(D). Garcia argues that the term "unlawful user" is unconstitutionally vague as applied to him:

> Does ["unlawful user"] mean someone who has used a controlled substance once in his or her life, no matter when that use occurred? Twice? How many times must one use drugs to be an "unlawful user"? Or must the use be of a certain character? Must it be somehow connected to the possession of a firearm?

Garcia suggests that, because the Utah Code offers no guidance as to what boundaries the term "unlawful user" imposes, to overcome a constitutional vagueness problem, this court should interpret the language narrowly.

¶55 The United States Supreme Court articulated the policy behind the vagueness doctrine in *Grayned v. City of Rockford*:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."

408 U.S. 104, 108–09 (1972) (second alteration in original) (citations omitted).

¶56 This doctrine involves two considerations.

> First, a criminal statute is not unconstitutionally vague "if it 'defines the criminal offense with sufficient

definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" Second, "when a vagueness challenge does not involve First Amendment freedoms, [this court] examine[s] the statute only in light of the facts of the case at hand."

*United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) (alterations in original) (citations omitted).

¶57 Federal courts have recognized possible constitutional vagueness concerns with United States Code title 18 section 922(g)(3), which contains nearly identical language to Utah Code section 76-10-503(1)(b)(iii), (3).

Section 922(g)(3) prohibits 'an unlawful user of . . . any controlled substance' from possessing a firearm. The term 'unlawful user' is not otherwise defined in the statute, but courts generally agree the law runs the risk of being unconstitutionally vague without a judicially-created temporal nexus between the gun possession and regular drug use.

*United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003) (alteration in original), *cert. granted, vacated,* 543 U.S. 1099 (2005), *reinstated,* 414 F.3d 942 (8th Cir. 2005).

¶58 Garcia suggests two interpretations of "unlawful user" that he posits would avoid the vagueness problem. Garcia prefers an interpretation that requires a person to be "actually using a controlled substance at the time he or she is in possession of the firearm." But he alternatively offers the interpretation many federal courts have given to similar language. The federal interpretation requires a "temporal nexus between the gun possession and regular drug use." *Patterson*, 431 F.3d at 839 (citation omitted); *United States v. Ocegueda,* 564 F.2d 1363, 1366 (9th Cir. 1977) (upholding statute as constitutional as applied to defendant because evidence supported finding that defendant's drug use was consistent, prolonged, and contemporaneous with his firearms purchases to put him on notice that he qualified as an unlawful user).

¶59 As an initial matter, we reject Garcia's chosen reading of the statute requiring a person to be "actually using a controlled substance at the time he or she is in possession of the firearm." Principles of constitutional avoidance are not an invitation for us to break faith with the statute's text. Constitutional avoidance rests "on

the reasonable presumption" that where there is more than one plausible interpretation of a statute, the legislature "did not intend the [interpretation] which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *see also Utah Dep't of Transp. v. Carlson,* 2014 UT 24, ¶ 23, 332 P.3d 900 ("[W]hen a court rejects one of two plausible constructions of a statute on the ground that it would raise grave doubts as to its constitutionality, it shows proper respect for the legislature, which is assumed to 'legislate[] in the light of constitutional limitations.'" (second alteration in original) (citation omitted)). Even when we are trying to save a statute from constitutional concerns, we are not at liberty to rewrite the statute or to inject the statute with our policy judgments. Our job is to interpret the statute as the legislature wrote it.

¶60  As with the federal statute, the Utah Code "does not forbid possession of a firearm *while unlawfully using* a controlled substance. Rather, the statute prohibits *unlawful users* of controlled substances . . . from possessing firearms." *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002). The reading Garcia prefers would require us to rewrite the statute to include a concept of contemporaneous use that the plain text does not require and is not necessary to preserve the statute's constitutionality—as explained below. And while not dispositive, we cannot find any other jurisdiction that has accepted a reading like the one Garcia advocates. In fact, many jurisdictions have rejected that interpretation. *See, e.g.*, *United States v. Clanton*, 515 F. App'x 826, 830 (11th Cir. 2013) (rejecting contention that an "unlawful user" requires proof that defendant was under influence at time of possession); *United States v. Burchard*, 580 F.3d 341, 346, 352 (6th Cir. 2009) (holding that "[t]he law does not require that the Defendant used the controlled substance at the precise time he possessed the firearm"); *United States v. McIntosh*, 23 F.3d 1454, 1458 (8th Cir. 1994) (rejecting as too restrictive a definition of "unlawful user" that requires proof that the defendant "was using the controlled substance at the same time he was in possession of the firearm").

¶61 Garcia's second proffered interpretation, in contrast, comports better with the statute's text and has been accepted by a number of federal courts. For example, the Fifth Circuit Court of Appeals has held that in order to give a defendant fair notice of what would make him an "unlawful user" of a controlled substance, the State must forward evidence to show "some regularity of drug use in addition to contemporaneousness" to the possession of a firearm.

*Patterson*, 431 F.3d at 838–39; *United States v. Augustin,* 376 F.3d 135, 139 (3d Cir. 2004) ("[T]o be an unlawful user, one needed to have engaged in regular use over a period of time proximate to or contemporaneous with the possession of the firearm."); *Jackson,* 280 F.3d at 406; *United States v. Purdy,* 264 F.3d 809, 812 (9th Cir. 2001). This reading solves the problem that Garcia highlights in his brief, that the phrase "unlawful user" might criminalize possession of a firearm by someone who used a controlled substance decades ago. And, more to the point, it solves the vagueness problem that the statute does not provide adequate notice to someone that they could be breaking the law if they used drugs in 1967 and carry a firearm in 2017. But it preserves the legislative intent that those who could reasonably be considered to be "unlawful users"—those who use with regularity and in a time period reasonably contemporaneous with the possession of a firearm—be subject to criminal sanction.

¶62 Because Garcia's counsel did not ask for a jury instruction reflecting the narrowed interpretation—and Garcia does not claim ineffective assistance based upon that—we review to see whether the district court properly denied the directed verdict motion. "A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.,* 1999 UT 14, ¶ 3, 975 P.2d 467. Garcia moved for a directed verdict arguing that if the court would properly interpret the statute, the State had introduced insufficient evidence to sustain a conviction. We hold that any error the district court committed in failing to interpret the statute in a manner that avoided constitutional concerns was harmless because evidence existed to permit the jury to convict Garcia under a proper interpretation of the statute.

¶63 Garcia admitted that he had used cocaine since 2006 when he "was twenty-five about to turn twenty-six." He also told the police,

> When I'm off cocaine, too, I get like real paranoid. I just think the cops gonna run in my shit. So, uh, yeah cuz I do a lot of cocaine like sometimes.
>
> . . . .
>
> Q: [I]t's odd that you use, because lots of people who really got skills don't use at all.

> A: Yeah, no, it's just my heart and soul is into this shit man, you know what I mean?

¶64 Garcia's statements demonstrate that there was an evidentiary basis for the jury to conclude that Garcia was a user of cocaine. He stated, "I do a lot of cocaine like sometimes." And his statement "when I'm off cocaine, too, I get real paranoid" gives rise to a reasonable inference that there are times when he is *on* cocaine. In response to a police sergeant's incredulity that he would both use and deal, Garcia did not assert that he had stopped using; rather he responded that his "heart and soul is into this shit." When Garcia talked about his drug use, he did so in the present tense.

¶65 Garcia responds that this evidence is insufficient to demonstrate that his cocaine use shared any temporal nexus with his firearm possession. Garcia raises a logical, albeit ultimately unavailing, point. Perhaps the easiest way for the State to meet its burden would have been to introduce evidence of the last time Garcia had ingested cocaine prior to the date he possessed the firearm that gave rise to the charge. But the fact that the evidence did not identify the date of Garcia's last cocaine use does not dictate the conclusion that there was insufficient evidence of Garcia's on-going drug use to survive a motion for a directed verdict. The evidence was sufficient to permit a jury to reasonably conclude that Garcia's confessed drug use—he does a lot of cocaine sometimes, gets paranoid when he goes off, has his heart and soul into drugs—meant that he was a user of controlled substances on the night he fired his weapon, even if the jury could not conclude that he was using drugs on the day of the charged conduct. Other courts have reached a similar conclusion. *See, e.g.*, *United States v. Edwards*, 540 F.3d 1156, 1162 (10th Cir. 2008) (holding that "[w]hile it is true that the government did not introduce specific, direct evidence pinpointing precise dates on which Defendant used drugs," there was sufficient evidence to uphold an unlawful user in possession charge where the jury heard testimony that the defendant was a "habitual, heavy user of marijuana at the time the conspiracy was in effect, and none of the witnesses indicated that Defendant's drug usage changed or varied over the year of the conspiracy"), *cert. denied*, 555 U.S. 1124 (2009); *United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006) (upholding unlawful user in possession conviction for event taking place in October 2004 where the evidence presented at trial demonstrated that defendant used marijuana daily until August 2004, admitted recreational cocaine use, and tested positive for marijuana use in

April 2005). We therefore find that any error the district court committed in failing to narrow the meaning of "unlawful user" in connection with the motion for a directed verdict was harmless.

## CONCLUSION

¶66 The court of appeals erred when it failed to perform fully the prejudice analysis *Strickland v. Washington* requires. *See* 466 U.S. 668 (1984). But Garcia was not prejudiced by his counsel's complicity in the jury receiving a flawed instruction. The evidence that Garcia committed attempted murder is sufficiently strong that our confidence in the jury's verdict is not undermined. Therefore, we reverse the court of appeals' conclusion that Garcia was prejudiced by his counsel's performance. We reaffirm that a party may invoke previously unargued canons of statutory interpretation on appeal if the issue of the statute's proper interpretation was preserved. Although the district court should have interpreted the "unlawful user" statute differently to avoid constitutional vagueness problems, that error was harmless. The State introduced sufficient evidence to permit a jury to convict Garcia even under a narrowed interpretation of that statute. We affirm Garcia's conviction for possession of a firearm by a restricted person. In short, we reverse in part and affirm in part.

————————