2018 UT App 161

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HARLIN ARGELIO RAMOS,
Appellant.

Opinion
No. 20160075-CA
Filed August 23, 2018

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 141904935

Debra M. Nelson, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1      *"Please don't kill me. I have kids."* Victim's plea was in vain, as Defendant Harlin Argelio Ramos stabbed him eight times, including a fatal thrust to the heart. After fleeing the scene, police located and arrested Ramos. In his interview, Ramos alleged that Victim had been the aggressor and that he had only acted in self-defense. The State charged Ramos with murder. At trial, the judge instructed the jury on both perfect and imperfect self-defense, and on the lesser-included offense of imperfect-self-defense manslaughter. One of those instructions was flawed, but the error was not prejudicial. The jury convicted Ramos as charged, and he timely appeals. We affirm.

BACKGROUND

*The Murder*

¶2     Shortly after 1:00 a.m. on a mid-April morning, Victim and Friend had just finished watching a late movie at a movie theater. Because they had driven separately, Victim walked Friend to her car and she drove him back to his own. Before parting ways, the two talked in the car. While they conversed, Friend noticed two men—Ramos and his accomplice (Accomplice)—walk in front of her car and look at her in a way that "made [her] very uncomfortable." The men's behavior alarmed her so much that she removed her Taser from the glove compartment and rested it on the center console. Victim, however, seemed unconcerned about the men and continued their conversation.

¶3     Just as Victim was about to exit the vehicle, Ramos suddenly opened the passenger door and thrust his "whole arm" inside. Friend thought Ramos was reaching for her keys in an attempt to rob her. Victim pushed Ramos away and the two struggled outside of the car. Meanwhile, Friend closed her passenger door and went to call 911, but accidentally dropped her phone on the car floor. She then locked her car doors, honked her horn, screamed for help, and tried to find her phone.

¶4     When Friend looked back up, Victim and Ramos were no longer within eyesight, so she opened her door and stepped out of her car to find them. She heard Victim screaming "Please don't kill me. I have kids. Please don't kill me." Friend then grabbed her Taser and ran around to the front of her car. She found Victim on the ground with Ramos straddling Victim's lower abdomen and upper legs. She thought that Ramos was punching Victim, so she approached Ramos from behind and applied her Taser to the back of his pant leg, but it had no effect.

¶5    Realizing that the Taser needed to contact skin, Friend pulled down the collar of Ramos's jacket and applied the Taser to the back of his neck. Ramos tried to fight her off, and she ran back to her car, locked her car doors, began honking her horn and screaming for help. Having located her phone, she then dialed 911. Ramos and Accomplice then fled the scene on foot and were soon thereafter picked up by a taxi driver.[1] As Friend waited for someone to answer her 911 call, she saw Victim stagger in front of her car and fall near her door. Friend opened her door and heard Victim say, "I'm dying. Please help me."

¶6    As the 911 operator answered, an off-duty paramedic (Paramedic) responded to Friend's cries for help. Paramedic testified that, as he approached, he saw Ramos "cross in front of him and look directly at him." Paramedic rolled Victim onto his back to triage and treat his injuries, and soon thereafter he started CPR.

¶7    Meanwhile, Witness, whose apartment overlooks the crime scene, was watching television at home when he heard a woman screaming for help. From his vantage point, Witness saw two men assaulting another man and pinning him to the ground. Thinking that a robbery was in progress, Witness went to help, but by the time he arrived, Paramedic had already begun treatment. Police and on-duty paramedics soon arrived and took over, but Victim had already passed away.

---

1. The taxi driver (Taxi Driver) and Ramos were well-acquainted: Ramos used Taxi Driver's service regularly, getting rides approximately "two to three times a week," and Taxi Driver allowed Ramos to use Taxi Driver's home address to purchase a cell phone because Ramos lacked a permanent address. The day before the murder, Taxi Driver also paid for Ramos's room at the motel where Ramos was later arrested by police.

¶8    Victim suffered nine sharp-force injuries: three to his chest, two to his upper back, two to his abdomen, one to his armpit, and one to the back of his right hand that was consistent with a defensive injury. All wounds were likely inflicted by a single-edged knife. The blade had entered Victim's chest and penetrated completely through his heart, "fully perforat[ing]" his "right ventricle." This was "a lethal injury" that stopped Victim's heart "within minutes." Victim's left lung was punctured twice, once from the front and once from the back, which hastened his death.

*The Arrest*

¶9    Before police arrived, Ramos and Accomplice[2] fled the scene as Victim bled out. On arrival, police found two backpacks on site, one of which contained a cell phone receipt with Ramos's name on it, as well as his identification card. Police eventually located Ramos at a motel and arrested him. In the motel room, police found a t-shirt, a black jacket, and black athletic pants—all bloodstained—in the trash can in Ramos's room. DNA testing revealed Victim's blood on the t-shirt, jacket, and pants. Additionally, Ramos's fingerprint was on the front passenger door of Friend's car.

¶10   Ramos was given his *Miranda* warnings[3] and agreed to be interviewed by police. He informed police that he did not speak English, so the interview was conducted in Spanish. His interview resulted in several conflicting accounts. Initially, Ramos said that he and Accomplice had planned to meet a "taxi" from "someone who had a white sedan" and had mistaken

---

2. Accomplice never contacted police about the case, nor were the police ever able to find him.

3. *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Friend's car for the taxi. He further alleged that as he approached the door, Victim had jumped out and started hitting him in the head, grabbed his throat, and lifted him completely off of the ground. Ramos stated that as Victim hit him, Ramos said "'sorry, sorry,' and 'no problem,'" in English, but Victim continued to choke Ramos until he "became desperate" because he was "being asphyxiated." Ramos said he exclaimed, "Help me, help me, he is going to kill me," and then pulled out his knife and stabbed Victim.

¶11 When a detective told Ramos to "tell the truth," Ramos responded by claiming he was "confused" and maintained that he was attacked by Victim. But he then stated that he believed that Victim was somehow associated with a violent street gang and feared that they had come to harm him.

¶12 When the detective again asked Ramos to tell the truth, Ramos gave yet another version of the events, claiming that he had approached the vehicle because "he was selling drugs and he thought the people in the car wanted some." He continued to state that Victim had exited the car, began hitting and choking him, and because Ramos had drugs in his mouth that night, he spit them out when he was choked. But police did not recover any drugs at the murder scene or in Ramos's backpack or motel room. Ramos also told police initially that he dropped the knife as he fled the scene, but later said that he "may have thrown it away" with his clothing. Despite a thorough search, police did not find a knife in the area.

*The Taxi Driver*

¶13 Three days after the murder, the police interviewed Taxi Driver. He also testified at trial, but his two accounts differ significantly. During his police interview, Taxi Driver told police that Ramos called him "around 1:00 a.m., 1:30 a.m., or 1:40 a.m." But when police asked to see Taxi Driver's phone log, he said that he had deleted it. A review of Ramos's phone records

showed no outgoing calls to Taxi Driver during the 1:00 a.m. hour. Instead, Ramos's log showed only that Taxi Driver had called him at 1:08 a.m. that morning. Taxi Driver testified that after he got Ramos's call, it took him "fifteen or twenty minutes to drive from his West Valley home to [the murder scene], and that he parked and waited another fifteen or twenty minutes before [Ramos] and [Accomplice] 'arrived.'" Taxi Driver also initially told police that he did not see the fight and that Ramos claimed to have been hit, but did not mention being strangled.

¶14   Taxi Driver testified differently at trial. There, he stated that he operated a private taxi service and that on the night of the murder, Ramos called him in the early morning for a ride. Taxi Driver claimed that he saw both Ramos and Accomplice getting into a car. He then saw an angry man get out of that car and heard Ramos say in Spanish, "This isn't the right car, sorry."[4] Taxi Driver said that the man refused to accept the apology and fought with Ramos. Taxi Driver further testified that he never saw Ramos with a knife but did see a woman try to tase Ramos. Taxi Driver stated that Ramos looked "dizzy" and fell, and that he "was bleeding all over [the left side of] his face," but photographs taken upon Ramos's arrest show only one abrasion on his forehead and no other injury to his face.

¶15   When asked about the discrepancies in his accounts, Taxi Driver testified that he was "nervous" during the police interview and "might have omitted a few details here and there." Taxi Driver asserted that he had testified to "the truth"—that he witnessed the fight, including Ramos being choked, and that Ramos had asked for help because the man was "killing him."

---

4. Taxi Driver arrived in his car, a white Nissan Versa. The Versa was a hatchback without tinted windows. Friend's car was a white four-door Toyota Corolla sedan with tinted rear windows.

*The Strangulation Evidence*

¶16    Ramos suffered minor injuries. At the time of his arrest, he had scratches on his neck, a scrape on his forehead, and one abrasion above his left clavicle. At trial, two experts testified to his injuries, Defense Expert and Medical Examiner. Medical Examiner testified that he did not see evidence of petechial hemorrhaging[5] or other signs of strangulation, and opined that "[y]ou'd expect to see damage both externally as well as internally" if a person were lifted completely off the ground by their neck. In contrast, Defense Expert testified that Ramos showed signs of strangulation—abrasions on his neck and petechiae on his skin.[6] Her opinion was founded on her review of police photographs taken when they arrested Ramos, as well as her own examination and interview of Ramos more than thirteen months after the murder. However, Defense Expert conceded that the scratches could have been consistent with having been tased on the neck by Friend.

*Summary of Proceedings*

¶17    The State charged Ramos with one count of murder. At trial, Friend testified that she heard Victim screaming, "Please

---

5. Petechial hemorrhaging is caused by significant strangulation. *State v. Lopez*, 789 P.2d 39, 41 n.2 (Utah Ct. App. 1990). "High pressure arterial blood continues to pump into the head from the heart while blood is unable to leave the head through the veins because of the ligature. As the pressure builds, blood vessels burst, resulting in hemorrhaging in the skin and the whites of the eyes." *Id.*

6. When medical personnel examined him the day of his arrest, Ramos did not mention, much less complain, that he had been strangled. He also showed no difficulty eating or drinking and never asked police for any medical treatment.

don't kill me. I have kids. Please don't kill me." Thereafter, the prosecutor asked Friend what kind of cell phone Victim had and whether she knew "what was on the screen of his cell phone?" Friend responded, "He had a picture of his two little boys." When the prosecutor asked, "A picture of his two little boys?" Friend nodded her head affirmatively. The prosecutor never introduced the picture of Victim's two boys.

¶18    The judge then instructed the jury on both perfect and imperfect self-defense, and on the lesser-included offense of imperfect-self-defense manslaughter. While the imperfect-self-defense instruction correctly instructed the jury on the State's burden of proof, both parties agree that the instruction on imperfect-self-defense manslaughter misstated that burden.[7] Instruction 34, which defined the elements of imperfect-self-

---

7. The State concedes that Instruction 34 was flawed. The three other related instructions were correctly given. First, Instruction 33 correctly stated the elements instruction for murder, informing the jury that to convict Ramos of murder, the State had to prove beyond a reasonable doubt that Ramos intentionally or knowingly killed Victim without any legal justification. Second, Instruction 39 correctly explained the State's burden to disprove self-defense, stating, "Once self-defense is raised by the defendant, it is the prosecution's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense." Instruction 39 continued, "The defendant has no particular burden [of] proof but is entitled to an acquittal if there is any basis in the evidence sufficient to create reasonable doubt." Finally, Instruction 48 correctly instructed the jury on the State's burden of proof on imperfect self-defense. It explained that the defense applies when a "defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused." It also explained that if the State did not carry its burden, Ramos could "only be convicted of Manslaughter Involving a Dangerous Weapon."

defense manslaughter, contradicted Instruction 48 and misinformed the jury about the State's burden to disprove imperfect self-defense. Instruction 34 incorrectly told the jury that it could convict Ramos of imperfect-self-defense manslaughter only if it found, beyond a reasonable doubt, that the defense applied. The instruction stated,

> You may consider the lesser included offense of "Manslaughter Involving a Dangerous Weapon." To do so you must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of that offense. That on or about April 19, 2014, in Salt Lake County, Utah:
>
> > 1. The defendant . . . individually or as a party to the offense;
> >
> > 2. Either:
> >
> > > (a) Recklessly caused the death of [Victim]; or
> > >
> > > (b) Caused the death of [Victim] under circumstances where the defendant reasonably believed the circumstances provide a legal justification or excuse for his conduct, although the conduct was not legally justifiable or excusable under the existing circumstances; and
> >
> > 3. A dangerous weapon was used in the commission or furtherance of this act.
>
> After you carefully consider all the evidence in this case, if you are convinced that each and every element has been proven beyond a reasonable

doubt, then you must find the defendant GUILTY of Manslaughter Involving a Dangerous Weapon. On the other hand, if you are not convinced that one or more of these elements has been proven beyond a reasonable doubt, then you must find the defendant NOT GUILTY of Manslaughter Involving a Dangerous Weapon.

¶19   The jury was further instructed that it could consider the offense of manslaughter under Ramos's imperfect-self-defense theory only if it found "from all of the evidence and beyond a reasonable doubt each and every one of the . . . elements of that offense." These statements impermissibly shifted the burden to Ramos because they either infer that the burden rests upon Ramos or they are vague concerning which party bears the burden of proof.[8]

¶20   The jury convicted Ramos of murder, and he timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶21   Ramos brings two claims on appeal. He first contends that his trial counsel was constitutionally ineffective for failing to object (1) to the erroneous imperfect-self-defense manslaughter jury instruction and (2) to the prosecutor's questions regarding photos of Victim's children on his cell phone. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of

---

8. Jury instructions should, at all times, clearly express that the State bears the burden of proof. *See State v. Lee*, 2014 UT App 4, ¶ 27, 318 P.3d 1164.

law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).

¶22    Ramos also argues that the cumulative effect of trial counsel's error "should undermine this Court's confidence in the jury's verdict." "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7 (cleaned up).


ANALYSIS

I. Ramos's Counsel Was Not Constitutionally Ineffective

¶23    "To ensure a fair trial, the Sixth Amendment of the U.S. Constitution guarantees the right to effective assistance of counsel." *State v. Campos*, 2013 UT App 213, ¶ 23, 309 P.3d 1160; *see also* U.S. Const. amend. VI. To prevail on an ineffective assistance of counsel claim, a defendant must (1) "identify specific acts or omissions demonstrating that counsel's representation failed to meet an objective standard of reasonableness," and (2) show that "but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different." *State v. Montoya*, 2004 UT 5, ¶¶ 23–24, 84 P.3d 1183 (cleaned up). In other words, to show constitutional ineffectiveness, Ramos must prove both deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687–89, 694 (1984); *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92.[9]

---

9. Ramos also argues that the court's failure to ensure proper jury instruction constitutes plain error. But a party to an appeal cannot take advantage of an error that it invited the trial court to commit. *See Pratt v. Nelson*, 2007 UT 41, ¶ 17, 164 P.3d 366. Thus,

(continued…)

A.     Failure to Object to the Flawed Jury Instruction

¶24   Because imperfect self-defense is an affirmative defense, Ramos was entitled to the benefit of it—reduction of a murder conviction to manslaughter—unless the State proved beyond a reasonable doubt that the defense did not apply. *See State v. Low*, 2008 UT 58, ¶ 45, 192 P.3d 867; *State v. Lee*, 2014 UT App 4, ¶ 27, 318 P.3d 1164; *Campos*, 2013 UT App 213, ¶ 38. The State concedes that sufficient evidence exists in the record to support the trial court's giving of a self-defense instruction. Thus, Ramos was entitled to a proper self-defense instruction. Accordingly, Ramos contends that his trial counsel was constitutionally ineffective by failing to object to the flawed jury instruction.

¶25   A court need not review the deficient performance element before examining the prejudice element. *See State v. Galindo*, 2017 UT App 117, ¶ 7, 402 P.3d 8. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Id.* (cleaned up). Here, we follow that course because Ramos cannot carry the heavy burden of demonstrating that the erroneous instruction prejudiced him.

---

(…continued)

"a jury instruction may not be assigned as error even if such instruction constitutes manifest injustice if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction." *State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742 (cleaned up). Here, Ramos did not merely fail to object; he agreed to the instruction. When the court discussed the proposed jury instruction for imperfect-self-defense manslaughter, trial counsel stated, "We don't have an issue with this instruction, Judge." Counsel therefore invited the error in the instruction and precluded any plain error review.

¶26 To prove prejudice, Ramos must demonstrate "a reasonable probability" that but for counsel's performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Thus, even when a jury instruction is erroneous, the error may nevertheless be harmless given the evidence. *See State v. Hutchings*, 2012 UT 50, ¶¶ 24–28, 285 P.3d 1183; *see also Green v. Louder*, 2001 UT 62, ¶ 17, 29 P.3d 638 (noting that an erroneous jury instruction is harmless if "we are not convinced that without this instruction the jury would have reached a different result").

¶27 Ramos argues that we must presume prejudice because there is "a reasonable basis for the jury to conclude that imperfect self-defense applied," and therefore "there is necessarily a reasonable probability . . . that, but for counsel's error, the result would have been different." (quoting *State v. Garcia*, 2016 UT App 59, ¶ 25, 370 P.3d 970, *aff'd in part, rev'd in part*, 2017 UT 53). When assessing the "reasonable probability that the jury would have returned a more favorable verdict . . . if properly instructed," *Lee*, 2014 UT App 4, ¶ 33, the court must "consider the totality of the evidence" before the jury, *see Hutchings*, 2012 UT 50, ¶ 28. When we consider the totality of the evidence here, we do not find a reasonable probability that the result would have been different had the jury been properly instructed.

¶28 In *State v. Garcia*, 2017 UT 53, our supreme court held that, based on the totality of the evidence, the defendant was not prejudiced by a similarly worded, erroneous imperfect-self-defense instruction. *Id.* ¶ 45 ("When we examine the record as a whole, counsel's error does not undermine our confidence in the jury's verdict finding [Defendant] guilty of attempted murder rather than attempted manslaughter. The evidence [in favor of attempted murder] overwhelmed the evidence that [Defendant] acted in imperfect self-defense.").

¶29　Like Ramos's jury instruction, the instruction in *Garcia* incorrectly stated that the jury "needed to find beyond a reasonable doubt that imperfect self-defense did not apply in order to convict [Defendant] of attempted manslaughter." *Garcia*, 2016 UT App 59, ¶ 11. This instruction was erroneous because it "improperly placed the burden upon [Defendant] to prove his affirmative defense beyond a reasonable doubt rather than correctly placing the burden on the State to *disprove* the defense beyond a reasonable doubt." *See State v. Lee*, 2014 UT App 4, ¶ 27, 318 P.3d 1164.

¶30　But on appeal, our supreme court concluded that the defendant suffered no prejudice because counsel's error did not undermine the court's confidence in the jury's verdict. "The evidence that [Defendant] was motivated by a desire to kill . . . overwhelmed the evidence that [Defendant] acted in imperfect self-defense." *Garcia*, 2017 UT 53, ¶ 45. Said another way, just because there was enough evidence to justify giving the imperfect-self-defense instruction does not mean that the jury would have found that it applied. The State's evidence against Garcia was so overwhelming that even had the proper instruction been given, there was not a reasonable probability that the outcome would have been different, since the jury could not "reasonably have found that Garcia acted in imperfect self-defense such that a failure to instruct the jury properly undermines confidence in the verdict." *Id.* ¶¶ 42–44.

¶31　Similarly, Ramos suffered no prejudice because there was no reasonable probability that but for his counsel's performance, "the result of the proceeding would have been different" such that the error "undermine[s] [our] confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Lee*, 2014 UT App 4, ¶¶ 29–33 (holding that even erroneous affirmative-defense instructions do not cause prejudice where overwhelming evidence against the defendant demonstrates that there is no reasonable probability that the jury would have

found that defendant acted reasonably or with legal justification).

¶32  The evidence against Ramos was so overwhelming that there was no "reasonable probability" that but for counsel's performance regarding the jury instruction, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Ramos alleged imperfect self-defense, but several factors weigh heavily against his claim. Victim was stabbed not once, but nine times; Ramos was not alone, but attacked Victim with the help of Accomplice; Ramos's injuries, in comparison to Victim's, were minimal; and after repeatedly and fatally stabbing Victim, Ramos did not seek or await law enforcement, but instead fled. Finally, when Ramos was apprehended and talked to law enforcement, he gave significantly inconsistent stories about what happened.

¶33  Furthermore, because Instruction 48 more plainly and separately outlines the burden of proof, it is not reasonably likely that the jury was confused as to the burden of proof, such that the outcome of the case would have been different. Instruction 48 read,

> Imperfect self-defense is a partial defense to the charge of Murder. It applies when the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused. The effect of the defense is to reduce the crime of Murder to Manslaughter Involving a Dangerous Weapon.
>
> The defendant is not required to prove that the defense applies. Rather, the State must prove beyond a reasonable doubt that the defense does not apply. The State has the burden of proof at all times. If the State has not carried this burden, the

defendant may only be convicted of Manslaughter Involving a Dangerous Weapon.

¶34 Where the instructions contained an express statement correctly identifying the party who bore the burden of proof, we find it unlikely that the jury misapplied the law. In the parlance of *Strickland*, we do not believe that the misstatement of the law changed the outcome in this case and we remain unpersuaded that correcting the instruction would likely change the result here.

¶35 Ramos's contention that he was prejudiced based solely on his entitlement to a correctly drafted imperfect-self-defense instruction fails. Because Ramos has not shown any error that undermines our confidence in the jury's verdict, we conclude that he did not receive ineffective assistance of counsel.

B.    Failure to Object to Questioning Regarding Victim's Children

¶36 Ramos also argues that his trial counsel was constitutionally ineffective by failing to object to Friend's testimony that Victim had a picture of his two sons on his cell phone. As discussed, to show that his counsel was ineffective, Ramos must prove both that his counsel performed deficiently and that he was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687–89, 694 (1984). Because there were multiple strategic reasons not to object, Ramos cannot demonstrate that no reasonable attorney would have failed to object, and his contention fails.

¶37 First, counsel could have reasonably concluded that the testimony was relevant. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Utah R. Evid. 401(a). Counsel could have reasonably concluded that the testimony that Victim had a

picture of his boys on his cell phone cleared this low threshold by helping corroborate Friend's account of the stabbing, including her testimony that Victim begged for his life because he had children.

¶38 Second, trial counsel could have reasonably concluded that the testimony about the cell phone picture was cumulative. The jury already knew from Friend's testimony that Victim was a father. Therefore, trial counsel could have reasonably chosen not to object based on the fact that the information was not new to the jury.

¶39 In sum, counsel had valid reasons not to object to the testimony Ramos now claims counsel should have opposed. Ramos therefore has not rebutted the presumption that his counsel's performance was objectively reasonable. *See Strickland*, 466 U.S. at 687–89. Because he fails to demonstrate deficient performance, we need not address prejudice, and his argument fails.

## II. Cumulative Error Doctrine Is Unavailing

¶40 Ramos' final contention is that because "the evidence that [he] was guilty of murder . . . was not overwhelming" the cumulative errors in his trial undermine the jury verdict. We are not persuaded, having concluded that the only error that occurred at trial was harmless.

¶41 The cumulative error doctrine applies only when "collective errors rise to a level that undermine[s] [an appellate court's] confidence in the fairness of the proceedings." *See State v. Perea*, 2013 UT 68, ¶ 105, 322 P.3d 624. Here, we have not found any prejudicial error, and therefore the application of the cumulative error doctrine is inapplicable. *See State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17, *abrogated on other grounds by State v. Wood*, 2018 UT App 98.

CONCLUSION

¶42 Ramos's trial counsel did not provide constitutionally ineffective assistance in failing to object to the flawed imperfect-self-defense manslaughter jury instruction. Further, counsel did not provide ineffective assistance in not objecting to testimony regarding the picture of Victim's children on his cell phone. Finally, based on the lack of multiple errors, the requirements of the cumulative error doctrine have not been met.

¶43 Affirmed.

_____