2020 UT App 82

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROY BEN LEVERING,
Appellant.

Opinion
No. 20190198-CA
Filed May 29, 2020

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 161501998

Nicolas D. Turner, Attorney for Appellant

Brock R. Belnap and Joseph M. Hood, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES KATE APPLEBY and JILL M. POHLMAN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Roy Ben Levering was convicted of assault (domestic violence), domestic violence in the presence of a child, and criminal trespass (domestic violence). On appeal, he argues that his counsel was constitutionally ineffective in several respects and that the district court erred in not admitting certain evidence. We affirm.

## BACKGROUND

¶2     The victim (Victim) and her friend entered into a written lease agreement for a house (Residence) in March 2015. Victim's daughter also lived at the Residence and shared a bedroom with

Victim. Victim and Levering had a romantic relationship, and she allowed Levering to stay in the Residence for periods of time. Victim testified that she and Levering initially used illegal drugs during his stays. Levering never had his own bedroom in the Residence. Rather, "[h]e would just stay up for . . . five or six days and then crash out wherever he sat down." Victim further testified that Levering never paid rent or bills and never had a key to the Residence.

¶3 Levering admitted that he was not a party to the lease but asserted that he regularly slept on the couch or in Victim's bedroom. Levering also asserted that he was given a key at one time for "[a] couple months" but that Victim took the key from him when they were not getting along.

¶4 Over the course of nearly a year, Victim repeatedly asked Levering to discontinue staying at the Residence, but he refused. Victim testified that when she asked him to leave, Levering would respond that she "would go down with him if [she] were to turn him in," meaning that Levering would call the Division of Child and Family Services (DCFS) and report that Victim was using drugs with him, and DCFS would take Victim's daughter as a result. Victim summed up the living arrangement: "[Levering] would leave for days at a time and come back. And when he was there, [it was] just kind of a 'friends close, enemies closer' type situation. I just wanted him gone. And he just wouldn't go." She elaborated, "I can't tell you how many times I told him to leave. I told him in front of his friends. I told him a hundred times to leave and to leave us alone."

¶5 Victim testified that Levering powered a space heater in his van from December 2015 through February 2016 using electricity from the Residence, resulting in a power bill of over $1,500—which she could not pay—and her power being shut off. By the end of that February, Victim had endured enough, and, out of concern for the well-being of her daughter, she insisted that

Levering leave. She testified that she was not using drugs and no longer feared Levering's threats. Levering left the Residence, taking with him all his possessions and vehicles.

¶6     On April 12, 2016, Levering informed Victim that he was in town. She responded, via Facebook Messenger, by telling him "that he was absolutely not welcome" at her home. The next day, Levering, unannounced and uninvited, walked in the back door of the Residence "holding a bong and a bag of marijuana." Victim, whose daughter was in an adjoining room watching television, responded to Levering's intrusion by telling him that "he wasn't welcome," headbutting him, and "physically remov[ing] him from" the Residence. She followed up by shutting the door and locking it. Levering forced his way back into the Residence by breaking through the locked door. Levering admitted that he went back in the house after his expulsion, explaining that he "came back in to defend [his] innocence because [Victim] was trying to tell a lie." Victim walked toward Levering, "asked him what he was doing back in the house," and told him to leave. Victim described his reaction:

> He grabbed my arm. He spun me around and he held my hands behind me. He dropped me down to the ground in a bear hug. He squeezed me really hard. I couldn't breathe. My face was against the floor. I was screaming at him to get off of me. And then I heard my little girl screaming at him to get off of me.

Victim "grabbed [Levering's testicles] and squeezed as hard as [she] could." Levering released her and ran out the back door. Victim testified that she suffered bruises to her arm and knee as a result of the assault.

¶7     Levering was charged with assault (domestic violence), domestic violence in the presence of a child, and criminal trespass (domestic violence).

¶8 Prior to trial and in an effort to support a self-defense argument, Levering moved the court to admit evidence of Victim's "prior violent acts, violent propensities, and patterns of abuse, violence, within the relationship between" him and Victim, specifically evidence produced at a protective order hearing regarding Victim's conduct that occurred after the assault. The district court ruled that any "pattern of abuse or violence" that occurred after the assault would not "have anything to do with what's in [Levering's] head at the time . . . that he's allegedly protecting himself from [Victim's] violent acts." The court explained that violent acts committed by Victim that "happened [after the assault] as a reason that [Levering] was justified in using force at the time of the incident [were] not relevant." The court therefore excluded that evidence. However, the court clarified that "any acts, prior violent acts, propensities, patterns of abuse or violence in the parties' relationship, leading up until the time of the incident [were] fair game."

¶9 After the close of evidence, the court gave jury instructions. Relevant to the issues on appeal, the district court instructed the jury as follows. Instruction No. 9 addressed the burden of proof:

> A defendant in a criminal case is presumed to be innocent until proven guilty beyond a reasonable doubt. The presumption of innocence benefits the defendant throughout the trial until the plaintiff meets this burden. The burden never shifts to a defendant to call any witnesses, produce any evidence, or to disprove any allegation. All presumptions of law are in favor of innocence. If there is a reasonable doubt as to whether guilt is sufficiently proven, the defendant is entitled to a verdict of not guilty.
>
> The state has the burden of proving the defendant guilty beyond all reasonable doubt. . . .

¶10 Instruction No. 14, which addressed the charge of criminal trespass (domestic violence), listed the elements of the crime and instructed the jury that it could convict Levering only if the State proved each element beyond a reasonable doubt. But it did not include a provision about the open-to-the-public defense to prosecution for criminal trespass. *See* Utah Code Ann. § 76-6-206(4) (LexisNexis 2017) (stating that a defense to prosecution for criminal trespass is that "(a) the property was at the time open to the public; and (b) the actor complied with all lawful conditions imposed on access to or remaining on the property").[1]

¶11 Instruction No. 15 addressed the charge of assault (domestic violence), stating that Levering could not be convicted unless the jury found beyond a reasonable doubt each of the following elements: "One, the defendant committed an act with unlawful force or violence that caused or created a substantial risk of bodily injury to another; and two, the act involved domestic violence; three, the defendant did so intentionally, knowingly, or recklessly; and four, the defendant did not act in self-defense." Jury Instruction Nos. 16 and 17 related to self-defense, but neither instruction specified that the State carried the burden of proof to show that Levering did not act in self-defense.

¶12 The jury found Levering guilty as charged. Levering appeals.

ISSUES AND STANDARDS OF REVIEW

¶13 Levering raises two issues on appeal. First, he claims that trial counsel was constitutionally ineffective for failing to object to the jury instructions. He asserts that counsel should have objected to Instruction Nos. 16 and 17 for lacking a burden of proof

---

1. Because the relevant statutory provisions we cite have not been materially altered from those in effect at the time of Levering's actions, we cite the current code for convenience.

provision. He also contends that counsel should have objected to Instruction No. 14 because it did not include a defense to criminal trespass. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Galindo*, 2019 UT App 171, ¶ 6, 452 P.3d 519 (quotation simplified).

¶14 Second, Levering asserts that the district court erred in not allowing the defense to present certain evidence to demonstrate that he was justified in defending himself against Victim. "We review the legal questions to make the determination of admissibility for correctness; we review the questions of fact for clear error; and we review the district court's ruling on admissibility for abuse of discretion." *State v. Sanchez*, 2018 UT 31, ¶ 10, 422 P.3d 866 (quotation simplified).

ANALYSIS

I. Ineffective Assistance of Counsel

¶15 Levering asserts that counsel provided ineffective assistance with respect to the jury instructions in two ways. First, he argues that counsel should have objected to Instruction Nos. 16 and 17 because "those instructions failed to inform the jury that the State carried the burden of proving that self-defense was inapplicable during the incident in question." Second, he argues that counsel was ineffective for not objecting to Instruction No. 14, because that instruction did not "mention that lawfully being on the premises is a statutory defense to the alleged crime."

¶16 To prevail on an ineffective assistance of counsel claim, Levering must show that (1) "counsel's performance was deficient" and (2) this "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Levering's] claims under either prong." *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. To succeed on the first prong, Levering must overcome the strong presumption that his trial counsel rendered adequate assistance by persuading the court that "considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36. "If the court concludes that the challenged action might be considered sound trial strategy, it follows that counsel did not perform deficiently." *Id.* ¶ 35 (quotation simplified). To succeed on the second prong, Levering must "demonstrate a reasonable probability that the outcome of his . . . case would have been different absent counsel's error. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *See id.* ¶ 43 (quotation simplified).

## A.    Self-Defense

¶17    Levering first asserts that Instruction Nos. 16 and 17 were erroneous in not explicitly articulating that the State carried the burden to disprove that Levering was acting in self-defense when he attacked Victim and that his counsel performed deficiently in not objecting to the instructions on this basis. Assuming, without deciding, that Instruction Nos. 16 and 17 were erroneous as Levering asserts, we nevertheless conclude that Levering was not prejudiced.

¶18    Although we recognize that the two instructions could have been more explicit in explaining that the State bore the burden to disprove self-defense,[2] when analyzing an

---

2. In making this observation, we encourage judges, defense attorneys, and prosecutors to make every effort to ensure that explicit directives regarding the State's burden to disprove self-defense are included in jury instructions.

ineffectiveness claim, this court "must consider the totality of the evidence before the jury." *State v. Hutchings*, 2012 UT 50, ¶ 28, 285 P.3d 1183 (quotation simplified). And "in light of the evidence in the record" showing that Levering did not act in self-defense, we are not convinced there is a "reasonable probability of a different outcome had the jury instructions been rephrased or clarified" to specifically include the burden of proof respecting self-defense. *See id*.

¶19 Levering has not demonstrated that even if perfectly crafted jury instructions had been given, there was "a reasonable probability that the outcome would have been different, since the jury could not reasonably have found that [Levering] acted in . . . self-defense such that a failure to instruct the jury properly undermines confidence in the verdict." *See State v. Ramos*, 2018 UT App 161, ¶ 30, 428 P.3d 334 (quotation simplified); *see also State v. Garcia*, 2017 UT 53, ¶ 45, 424 P.3d 171 ("The evidence that [the defendant] was motivated by a desire to kill [the victim] overwhelmed the evidence that [the defendant] acted in imperfect self-defense.").

¶20 Here, Levering was not responding to any immediate threat. After having been forcibly ejected from the Residence and having the door locked behind him, Levering decided to return to confront Victim. Indeed, he admitted that there was no immediate threat and that he went "back in to defend [his] innocence because [Victim] was trying to tell a lie." Levering forced his way through a locked door and proceeded to attack Victim, causing her the injuries described above. *See supra* ¶ 6. Levering presented no evidence to show that he reasonably believed Victim presented an imminent danger to him once he was ejected from the Residence and standing outside its locked door. Nor did Levering offer evidence that Victim presented an ongoing threat such that he found it necessary to force his way back into the Residence to stop her from engaging in violence against him. Indeed, the very fact that he forced his way back into the Residence through a locked

door—for the stated purpose of defending his honor—suggests that he harbored little fear that Victim presented a physical threat to him. Under these circumstances, Levering has not shown that a jury was likely to conclude that he "reasonably believe[d]" he was defending himself against Victim's "imminent use of unlawful force." *See* Utah Code Ann. § 76-2-402(2)(a) (LexisNexis Supp. 2019); *see also State v. Berriel*, 2013 UT 19, ¶ 14, 299 P.3d 1133 ("Retaliation against a successful aggressor is illegal force used too late. Defensive force is neither a punishment nor an act of law enforcement but rather an act of emergency that is temporally and materially confined, with the narrow purpose of warding off the pending threat." (quotation simplified)).

¶21   Levering encourages us to consider the "totality of the evidence" to reach the conclusion that he reasonably believed Victim presented an imminent threat to him. Namely, he suggests that Victim was coming toward him after he forced his way into the Residence and that he merely "bear-hugged" her in response. But in making his self-defense argument, Levering fails to mention that he had unlawfully re-entered the Residence after his initial expulsion and that Victim responded by insisting he leave. *See* Utah Code Ann. § 76-2-405(1) (LexisNexis 2017) ("A person is justified in using force against another . . . to prevent or terminate the other's unlawful entry into or attack upon his [or her] habitation . . . ."). Any threat Victim presented to Levering had passed once Victim shut and locked the door behind him. Instead of retreating, Levering forced his way back in to protest his innocence. We fail to see how the jury would have found that an insult to Levering's honor or integrity constituted an imminent threat justifying the force Levering used against Victim. Thus, even if the jury had received well-crafted instructions on the burden with respect to self-defense, there is no reasonable likelihood that it would have acquitted Levering of assault. Consequently, Levering did not suffer prejudice even if his counsel performed deficiently in not objecting to the possibly defective instructions.

B.     Trespass Defense

¶22    Levering next argues that his trial counsel performed deficiently in not objecting to Instruction No. 14. He asserts that the instruction given by the court was "erroneous and inadequate" because it did not include a defense to criminal trespass as provided by Utah statute. But given the residential nature of the Residence, Levering's argument is unavailing. The statutory defense to trespass has two prongs:

> It is a defense to prosecution under this section [i.e., criminal trespass] that:
>
>> (a) the property was at the time open to the public; and
>>
>> (b) the actor complied with all lawful conditions imposed on access to or remaining on the property.

Utah Code Ann. § 76-6-206(4) (LexisNexis 2017). Thus, to persuade us that his counsel performed deficiently, Levering must show that the defense applied—i.e., that the Residence was open to the public and that he complied with the lawful conditions of being there. The failure to offer evidence and a convincing argument suggesting that the Residence was open to the public obviates the need to consider whether he lawfully accessed the property. And we conclude that Levering failed to show that the Residence was "open to the public." *Id.*

¶23    This court has previously stated that "'open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe no permission to enter or remain is required." *Steele v. Breinholt*, 747 P.2d 433, 435 (Utah Ct. App. 1987) (quotation simplified). Levering offered no evidence that the Residence was open to the public under the standard articulated in *Steele*. In fact, Levering himself testified

that the doors of the Residence were locked on the day of the assault and that he obtained access only once Victim opened the door. He also testified that the "house [was] locked down, windows screwed shut. That was the norm." But on appeal, Levering contends that a "reasonable person" in his "situation would believe that no permission to enter or remain in the [Residence] was required because he had been living in the [Residence]." Levering further argues that "[u]nder this Court's prior definition of 'open to the public,' [the Residence] was 'open to Mr. Levering,' and therefore, the first prong of the affirmative defense appears to be satisfied." We are unconvinced by Levering's "public of one" argument.

¶24    First, Levering offers no citation to any authority, and we are not aware of any, to support the proposition that "open to the public" includes properties that are private homes. *See Salt Lake City v. Anderson*, No. 981507-CA, 1998 WL 1758333, at *1 (Utah Ct. App. Dec. 3, 1998) (per curiam) (indicating a shopping mall is open to the public); *Salt Lake City v. Grotepas*, 874 P.2d 136, 139 (Utah Ct. App. 1994) (concluding that an art school in a public building may be considered open to the public), *rev'd on other grounds*, 906 P.2d 890 (Utah 1995). Second, even if we were to accept Levering's argument that "open to the public" meant "open to Levering," the Residence was not open to him. To the contrary, Levering was not living at the Residence at the time of the assault. He was not a party to the lease. The Residence was locked, and Levering did not have a key or any other means of lawful access. Most significantly, he had specifically been told that he was not welcome numerous times, and Victim told him he was not welcome the day before he arrived. Finally, he was emphatically—and forcefully—told to leave by the legal occupant once he arrived.

¶25    In sum, because there is no support for the contention that the Residence was open to the public, we cannot conclude that

counsel acted deficiently in not asking that the jury be instructed on the statutory defense to criminal trespass in Instruction No. 14.

## II. Admissibility of Evidence

¶26   Levering's final argument is that the district court erred when it ruled that evidence from a protective order hearing, in which Victim admitted committing violent acts against him, was inadmissible. Levering asserts that the statements made at the hearing should have been admitted because "the statements pertain[ed] to actions that occurred prior to the incident" on April 13, 2016, and so were pertinent to his self-defense argument. *See* Utah Code Ann. § 76-2-402(5) (LexisNexis Supp. 2019) (stating that "the trier of fact may consider . . . the other individual's prior violent acts or violent propensities" and "any patterns of abuse or violence in the parties' relationship" "[in] determining imminence or reasonableness" in relation to using force in self-defense).

¶27   Assuming, without deciding, that the district court should have admitted the evidence of Victim's violent acts or propensities that was elicited at the protective order hearing, we limit our analysis to whether Levering was prejudiced by the omission of that evidence. "In circumstances where evidence should have been admitted, the failure to admit it is reviewed for harmless error. Exclusion is harmful if it is reasonably likely a different outcome would result with the introduction of the evidence and confidence in the verdict is undermined." *State v. Montoya*, 2017 UT App 110, ¶ 14, 400 P.3d 1193 (quotation simplified); *see also* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). Based on the record before us, we conclude that Levering was not harmed by the court's ruling on the admissibility of evidence of Victim's other violent acts elicited at the protective order hearing.

¶28   Levering has failed to show prejudice arising from the district court's refusal to admit the disputed evidence. Ample

testimony of Victim's violent behavior toward Levering was presented to the jury for its consideration in determining whether Levering faced an imminent threat from her at the time of the assault. Victim admitted to acting violently toward Levering before the incident: "Every time he brought drugs to my house, I reacted violently." Specifically, she admitted to "pushing [Levering] away from" the Residence and swinging a banister at Levering because he would not leave her property, resulting in police involvement. In summarizing the tone of their relationship, Victim stated, "We had a very volatile relationship. I absolutely will agree to that. And every single time that I got violent with him, it was because he brought drugs to my house where my little girl lived. Every time."

¶29 Levering has not made any effort to explain what the disputed evidence would have added to the evidentiary landscape. Levering asserts that the district court's decision "created an undue prejudice against [him] by not allowing him to bring forth the evidence of [Victim's] pattern of abuse and domestic violence against him." Specifically, he argues that the disputed evidence "contained testimony made under oath by [Victim] during [the protective order hearing], wherein [Victim] admits to assaulting . . . Levering on more than one occasion before the incident on April 13, 2016." But as noted above, Victim repeatedly admitted in her testimony that before the incident, she "got violent" with Levering. Levering does not explain how any of the evidence that came out at the protective order hearing would have made a difference to the jury's finding of guilt, especially in light of Victim's testimony regarding the overall volatility of the relationship and the violent acts she had previously taken against him. Given that the jury heard plentiful testimony—including Victim's own admission—that Victim had acted violently on numerous occasions toward Levering, we conclude that Levering was not prejudiced by any error the district court may have committed in excluding the evidence elicited at the protective order hearing.

CONCLUSION

¶30　We conclude that Levering was not harmed by any shortcoming of trial counsel in failing to object to jury instructions lacking an explicit burden of proof provision regarding self-defense. We further conclude that trial counsel did not perform deficiently in failing to object to the jury instruction without a trespassing defense. Lastly, any error the district court committed in excluding post-assault evidence from Victim's protective order proceeding was harmless.

¶31　Affirmed.

_____