**2020 UT App 121**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JONATHAN FRANCISCO DELGADO,
Appellant.

Opinion
No. 20181040-CA
Filed August 20, 2020

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No.171900028

Cherise Bacalski and Emily Adams,
Attorneys for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES KATE APPLEBY and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1 After he shot and killed a man in response to a text message he found disrespectful, and then hid the murder weapon in a toilet tank, Jonathan Francisco Delgado was convicted of murder and obstruction of justice. Delgado now appeals, contending that his trial counsel rendered constitutionally ineffective assistance. We reject Delgado's claim, and affirm his convictions.

## BACKGROUND[1]

¶2    Delgado was friends with a co-worker, Antonio,[2] who lived in an apartment with his sister, Miranda. Antonio was also friends with the occupant of the apartment across the hall (Ronald), who at that time was allowing another friend of his—the eventual murder victim (Victim)—to live with him temporarily. Antonio was also acquainted with Victim, having worked with him at a previous job.

¶3    At some point on the day of the murder, Miranda told her brother Antonio about a text message she had received from Victim, in which Victim sent a picture of himself "flashing money" and asking Miranda to "hook up and have birthday sex" with him. This "upset" Antonio, and he told Miranda that he would "talk to [Victim] about it" in the hopes that they could "settle it like men," perhaps in a fistfight.

¶4    Before that conversation could occur, Delgado picked up Antonio so that the two of them could go to work and run some errands. Sometime that day, Antonio called Miranda, and put Delgado on the phone. Though Miranda had never met Delgado, Delgado asked Miranda about Victim, telling her that he was

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly." *State v. Palmer*, 2014 UT App 272, ¶ 2, 339 P.3d 107 (quotation simplified).

2. Because of the number of individuals involved, and in an effort to maintain the privacy of non-party witnesses, we have chosen to use pseudonyms when referring to some of those individuals. *See State v. Jordan*, 2018 UT App 187, ¶ 4 n.2, 438 P.3d 862 (using pseudonyms for similar reasons). Specifically, Antonio, Miranda, Ronald, and Simon are pseudonyms.

going to "confront him" about the text message, to which Miranda responded that he should "leave it alone" and that it "was just a stupid text message."

¶5     On their way home, Antonio and Delgado purchased liquor, and after they got back to Antonio's apartment, they began consuming it. At some point that afternoon, Delgado asked Antonio if he knew where some methamphetamine ("meth") could be had. Antonio walked across the hall and passed that request along to his neighbor Ronald, who indicated that he had meth and that Delgado was welcome to come over and smoke it. When Antonio went back to his own apartment to relay the invitation to Delgado, he found Delgado lying on Antonio's bed and "pointing a gun at" Antonio. Antonio did not own any guns, but he knew that Delgado did. Antonio told Delgado to "put [the gun] away," and the two of them walked across the hall to Ronald's apartment.

¶6     Once inside Ronald's apartment, Antonio introduced Delgado and Ronald, who had not met before. Victim—Ronald's roommate—was not present. Ronald later stated that he "could tell [Antonio and Delgado] were intoxicated" when they arrived at his apartment. The three of them drank more liquor together, and Ronald and Delgado smoked meth. As they were drinking and smoking, Antonio asked Ronald where Victim was, stating that he needed to talk to Victim about why he was "texting [Miranda] all these text messages." Ronald testified that Antonio "started getting excited and he started getting mad" about the text message, and that Delgado agreed with Antonio, saying that "it was disrespectful that [Victim] sent [the message] to [Miranda]." At some point during their time together, Ronald noticed that Delgado had a "pistol on his thigh."

¶7     A few minutes later, Victim returned home to Ronald's apartment building. Ronald went downstairs to let Victim into the building, and warned him on the way up to the apartment

that Antonio was "really mad" at Victim for sending the text message to Miranda. Victim appeared unconcerned, and proceeded toward the apartment. Once there, Antonio confronted Victim, "yelling" at him and asking him about the text message. Victim then left the apartment and "took off running downstairs." Antonio followed, and grabbed hold of Victim's shirt, nearly ripping it off of him and causing both of them to fall down some stairs. Delgado followed them down the stairs. Ronald also left the apartment—without locking the door behind him—and observed the events from a landing area in the building's stairwell. Another neighbor, who could hear the events from inside his own apartment, described it as "a horrendous, angry, violent, showering fight."

¶8     At the bottom of the stairs, Antonio and Victim regained their footing, and continued arguing, with Delgado just "standing there." Eventually, Antonio and Victim went out the door of the apartment building, and thereafter Delgado exited the building as well. Soon after Victim left the building, he fell down, and Antonio took off his shirt and hit Victim with it. Antonio's version of events was corroborated by images captured from a surveillance camera across the street, which showed a person running outside, a second person running after him, the first person falling to the ground, and the second person taking off his shirt and hitting the first person with it. No gun can be seen in the second person's hands in the video footage.

¶9     Just "a couple [of] seconds" after Antonio, Victim, and Delgado all exited the apartment building, a gunshot rang out. Several witnesses heard the shot, including Ronald, Antonio, a neighbor, an employee of the business across the street, and two police officers who just happened to be conducting an unrelated traffic stop nearby. The shot struck Victim's torso, lacerating his heart and killing him within seconds.

¶10    Just "a few seconds after" the shot rang out, Ronald—still in the stairwell—saw Delgado come back inside the apartment building, with the pistol in his hand. Believing that Delgado had just shot Victim, Ronald asked Delgado, "What the f[***] did you have to do that for?" Delgado did not respond, and just kept walking up the stairs toward the apartments with a "blank face." Ronald then went outside and saw Victim's body, with Antonio standing next to it, and two officers approaching.

¶11    The two officers from the traffic stop had arrived at the scene quickly, and they observed Victim on the ground, bleeding profusely, and observed Antonio standing over Victim, still "yelling" at him "in an aggressive manner." The officers told Antonio to show them his hands and to "drop the gun," but neither officer actually saw a gun in Antonio's hands. Both officers later testified that, upon arriving on scene and seeing nobody else around, they initially believed that Antonio had shot Victim. According to Antonio, upon seeing the officers, he went into "panic mode[,] . . . got scared and . . . just ran back upstairs" into his apartment.

¶12    After Antonio returned to his apartment, he found Delgado there, wearing a bath towel. Antonio asked Delgado, "Did you shoot him?" Antonio characterized Delgado's answer differently throughout the proceedings. On the day of the shooting, Antonio told a detective that Delgado responded, "I don't know. Yes. Yes. Yes. I don't know." At the preliminary hearing, Antonio testified that Delgado "just said 'Shh,'" and "kind of stayed quiet." During trial, Antonio testified that Delgado "told [Antonio] he had shot him." At any rate, after Delgado responded to Antonio's question, Antonio asked Delgado where the gun was, and Delgado told Antonio that "he had hid[den] [the gun] and not to worry about it." Antonio testified that, at this point, he just felt "[p]anic," and he told Delgado to get out of his apartment, and emphasized the point by taking Delgado's belongings and "thr[o]w[ing] [them] next

door" toward Ronald's apartment. Antonio then called Miranda on Delgado's phone to "let her [and his mom] know what had happened." During the call, Antonio "told [Miranda] he didn't do it," that he "didn't shoot him," and that "Jonathan did it." Miranda testified that Antonio "sounded scared," and that she "never heard him like that before." After the call, on Miranda's advice, Antonio went outside and surrendered to police.

¶13 After this call, Miranda left work and traveled to the scene, where she found the block "swarmed with cops." Miranda realized that somebody was hurt, and kept calling Antonio on the phone he had called from—Delgado's. Eventually, Delgado answered the phone, and Miranda asked him what had happened, and Delgado replied that he shot Victim and that he had done it "for [Miranda]." Some twenty minutes later, Delgado called Miranda again, asking for information about "where . . . all the cops and stuff were at." Miranda testified that, during this call, she told Delgado to "just surrender yourself. They're going to get you." Miranda also testified that, during this call, Delgado was on another phone call, going back and forth from that call to hers.

¶14 Delgado's other phone call was with his friend Simon, who testified that Delgado called to ask Simon to come and pick him up and take him away from the apartment building. Simon testified that he did not know what was going on, but that Delgado eventually told him, "I think I just gave it to somebody," which Simon took to mean that Delgado had either beaten somebody up, or "shot somebody." When Simon arrived, however, he discovered that police officers were present on all of the streets surrounding the apartment building, and he told Delgado he would be unable to pick him up.

¶15 During this time, police officers were engaged in securing the scene, one part of which was evacuating everyone from the apartment building. In the course of doing this, at least forty-five

minutes after the shooting, officers came in contact with Delgado, who was standing at the top of a flight of stairs talking on the phone. An officer testified that, upon being approached by officers, Delgado "appeared surprised" that officers wanted to talk to him, which struck officers as odd given the "overwhelming police response" including "lights and sirens." Officers took Delgado into custody without incident, and continued clearing the building.

¶16   After taking Delgado into custody, officers questioned him about the day's events. Delgado told officers that he had been talking to his girlfriend on the phone for at least forty minutes when officers encountered him. When officers checked Delgado's phone, they found that he had made no calls of that length, but noticed that the phone did show the calls to Miranda's phone, discussed above. When asked for the name of the girlfriend with whom he supposedly had been speaking, Delgado initially identified Miranda, but then told officers he had been "talking to a lot of girls" and that he did not "understand how it's relevant." Police later learned, from a more thorough search of Delgado's phone, that he had been speaking to Simon (and asking for a ride) when police encountered him.

¶17   After they secured the scene, officers scoured it for additional evidence, and conducted a separate search of Delgado's residence. Perhaps of most significance, officers discovered a black semi-automatic pistol hidden in the toilet tank inside Ronald's apartment. The gun was loaded and a cartridge was in the chamber. At trial, Ronald identified the pistol as the one he saw on Delgado's thigh while Antonio and Victim were arguing, and in Delgado's hand after the gunshot, and Antonio identified it as the gun he had seen Delgado point at him in his bedroom just prior to the shooting. Officers searched the area for fingerprints, and were unable to find any on the gun itself, but did find one partial fingerprint on the side of the toilet tank. Officers also located a spent shell casing near

the apartment building door that Ronald had seen Delgado pass through just seconds before the shooting, a location that was some distance from where Victim's body was found and Antonio had been standing. Later, Victim's autopsy revealed that he had not been shot at close range. That shell casing was later determined to be the same brand and type as the bullet recovered from Victim's body as well as the cartridge found in the gun recovered from the toilet tank. Moreover, some of the ammunition discovered in a search of Delgado's residence was also the same brand and type.

¶18 After completing its investigation, the State charged Delgado with one count of murder (a first-degree felony) for killing Victim, and one count of obstructing justice (a second-degree felony) for hiding the gun. As the case proceeded toward trial, it became clear that Delgado planned to defend the case by asserting that Antonio, and not Delgado, had shot Victim. After all, Antonio was Miranda's brother, and therefore had more reason to be upset about the text message than Delgado did; moreover, it was undisputed that Antonio was indeed upset about the text message and had engaged in a scuffle with Victim about it and was discovered standing over Victim, yelling at him in an aggressive manner, right after Victim was shot. In addition, officers initially suspected that Antonio had been the shooter, and based on that suspicion had submitted two applications for search warrants on the day of the shooting in which one officer (Attesting Detective) attested that another officer "observed [Antonio] holding a handgun and pointing it toward the person who was on the ground."

¶19 Over the course of the seven-day jury trial, the State called more than twenty fact witnesses, including Antonio, Miranda, Ronald, Simon, and several law enforcement officers who were on scene. But the State did not call Attesting Detective, and released him from his subpoena a few days before trial began. The State also called several expert witnesses during its case-in-

chief, including the medical examiner, a toxicologist, a ballistics analyst, and two fingerprint analysts. The fingerprint witnesses each had analyzed the partial fingerprint lifted from Ronald's toilet tank, and each testified that it matched Delgado's fingerprint. In comparing the fingerprint found on the toilet tank to Delgado's fingerprint, the analysts applied the widely accepted "ACE-V" comparison process, which stands for Analyze, Compare, Evaluate, and Verify. During the Verify stage, the fingerprint must be examined by a second "competent examiner, who basically goes through the entire [ACE] process again, and then renders their decision as well." But in this case the second fingerprint examiner—who was serving as the "verifier"—did not conduct a "blind verification." That is, before beginning his analysis, he was aware that the first fingerprint examiner had concluded that the print was Delgado's.[3] Delgado's counsel extensively cross-examined both fingerprint witnesses, and established that they had not conducted a blind verification; that some (but not all) industry guidelines recommended that the verification process be conducted blindly; and that, although blind verification had not been standard operating procedure in the witnesses' laboratory at the time they did their examination of the toilet tank print, their laboratory had since made blind verification mandatory. But counsel did not ask the trial court to exclude the fingerprint testimony on the basis that no blind verification had been performed.

---

3. This court has determined that the ACE-V method of comparing and identifying fingerprints is generally reliable under rule 702 of the Utah Rules of Evidence. *See State v. Woodward*, 2014 UT App 162, ¶¶ 22–28, 330 P.3d 1283 (analyzing the threshold reliability of the ACE-V method under rule 702 of the Utah Rules of Evidence). Neither in that case nor any other, however, have we confronted the question of whether blind verification is necessary to admissibility under rule 702.

¶20    The State's final witness was the lead investigator, a police detective. During cross-examination of that witness, Delgado attempted to introduce the search warrant affidavits that had been prepared by Attesting Detective, which contained a statement indicating that one police officer had seen Antonio holding a gun and pointing it at Victim right after the shooting. The State initially objected, on the basis of hearsay, and the court sustained that objection. A few minutes later, in a sidebar conference, Delgado responded that he would like to call Attesting Detective but noted that the State had released him from subpoena and he was now out of town and would not return until the following Monday afternoon, the day the trial was scheduled to be finished. After the court held fast to its decision sustaining the objection, Delgado's counsel stated, "that's fine, . . . we'll just do it Monday" afternoon. But during a short recess, the attorneys reached "a stipulation of sorts" under which the State agreed to withdraw its objection and allow the lead investigator to read the two search warrant affidavits for the jury, and Delgado agreed not to call Attesting Detective on Monday afternoon, thus allowing the trial to conclude sooner. Cross-examination continued, and the investigator read both search warrant affidavits for the jury. On redirect, however, the investigator testified that Attesting Detective had no personal knowledge of the events described in the search warrant affidavits, because he was just relaying information received from others and had not actually spoken with the officers on scene who had observed Antonio. Those officers, as noted above, testified at trial that, although they yelled "drop the gun" to Antonio, they did not actually see a gun in Antonio's hands.

¶21    After the State rested its case, Delgado called two witnesses in his defense, but he elected not to testify. During closing argument, Delgado's attorney argued that it was Antonio—and not Delgado—who shot Victim. Counsel made little mention of the fingerprint evidence, and at one point even implied that there existed sufficient evidence from which the

jury could find that Delgado committed obstruction of justice by hiding the gun in the toilet tank for Antonio's benefit, a series of events which, in counsel's view, nicely explained Delgado's rather dodgy behavior upon encountering the police after the shooting while not implicating him as the shooter. Counsel also emphasized the search warrant affidavits, arguing that Attesting Detective had to have "got the information [about Antonio holding a gun] from somewhere," and that "logic tells you he got it from" the officers on scene who had observed Antonio.

¶22   After deliberation, the jury convicted Delgado on both counts, and the trial court later sentenced Delgado to prison.

ISSUE AND STANDARD OF REVIEW

¶23   Delgado now appeals, asserting that his trial counsel rendered constitutionally ineffective assistance. Delgado raises this issue for the first time on appeal, and therefore "there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *See Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

¶24   Delgado identifies two ways in which he believes his trial counsel rendered ineffective assistance. First, he asserts that counsel should have called Attesting Detective as a witness, rather than introduce his search warrant affidavits through the lead investigator. Second, he asserts that counsel should have filed a motion, pursuant to rule 702 of the Utah Rules of Evidence, asking the trial court to exclude the testimony about the toilet tank fingerprint, on the ground that the testimony was unreliable because of the absence of blind verification.

¶25   To establish a claim of ineffective assistance, Delgado must show both that (1) counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and that (2) counsel's deficient performance "prejudiced the defense" such that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *see also State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24. Delgado must make a sufficient showing on both parts of this test in order to establish that counsel provided ineffective assistance. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232. It is unnecessary "to address both components of the inquiry" if we determine that Delgado has made "an insufficient showing on one." *Id.* (quotation simplified); *accord Strickland*, 466 U.S. at 697.

¶26   In evaluating prejudice under the second part of the test, we assess whether there exists a reasonable probability that the case would have had a different outcome if trial counsel had not performed deficiently. *See State v. Garcia*, 2017 UT 53, ¶¶ 34–38, 424 P.3d 171. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing whether a defendant has met this standard, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Garcia*, 2017 UT 53, ¶ 28 (quotation simplified).

¶27   In this case, we conclude that—on both of the issues he raises—Delgado has not demonstrated a reasonable likelihood of a different result, even if we assume (without deciding) that Delgado's attorneys performed deficiently. We therefore confine our discussion of the issues accordingly.

I

¶28 Delgado first claims that his trial attorneys were constitutionally ineffective when "they did not ensure the attendance at trial" of Attesting Detective, whom Delgado characterizes as "a crucial defense witness." The State counters by pointing out that the main evidence Attesting Detective would have discussed—the search warrant affidavits he wrote indicating that Antonio was "holding a handgun and pointing it toward the person who was on the ground"—was presented to the jury during Delgado's cross-examination of the lead detective, and asserts that Delgado does not "explain how questioning [the Attesting Detective] would have produced more favorable evidence" than what was presented at trial, and cannot in any event carry his burden of demonstrating a reasonable likelihood of a different result had Attesting Detective testified at trial. We agree with the State.

¶29 Delgado's position regarding Attesting Detective is hampered by a major flaw: the search warrant affidavits Attesting Detective wrote were presented to the jury, through a "stipulation of sorts" during cross-examination of the lead investigator, after the State withdrew its hearsay objection. Thus, the key pieces of evidence that Delgado wanted to present through Attesting Detective were admitted into evidence, even without Attesting Detective being present at trial.

¶30 Moreover, the lead investigator testified that Attesting Detective did not speak with the officers who arrived first on the scene, did not speak directly with "any of the primary witnesses" in the case, and may not have ever visited the crime scene at all. Rather, Attesting Detective compiled the search warrant affidavits from information supplied to him from other officers, some of which—including the part about Antonio holding a gun—turned out to be inaccurate, at least according to the trial testimony of the officers who arrived first on scene. The

record before us does not contain any information indicating that Attesting Detective had any personal knowledge of the events described in the search warrant affidavits, and Delgado has not filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, to supplement the record to add any such information. In short, Delgado does not point to any evidence tending to show that Attesting Detective had personal knowledge of the relevant events, and does not provide any indication of what Attesting Detective's trial testimony might have been, had he been present to testify. Without knowing what his testimony would have been, and that it would have been helpful and admissible, we cannot reach the conclusion that his live testimony would have made a different trial outcome reasonably likely.[4]

¶31     Finally, the State's evidence against Delgado was strong. Three witnesses—Antonio, Miranda, and Simon—each testified that, in one form or another, Delgado acknowledged to them that he shot Victim. Two witnesses—Antonio and Ronald—saw Delgado with a gun during the events in question, and each identified the gun found in the toilet tank as the gun that had been in Delgado's possession. The spent shell casing found at the

---

4. Indeed, without any information about what Attesting Detective's testimony would have been, it is possible to draw an inference that Delgado may have been better off without it. Had Attesting Detective appeared at trial and confirmed that he had no personal knowledge, the search warrant affidavits—which Delgado admits are his "best evidence" that Antonio was the shooter—would have been worth a lot less. As it was, with Attesting Detective not present at trial, Delgado was at least able to argue, during closing, that Attesting Detective had to have "got the information [about Antonio holding a gun] from somewhere," and that "logic tells you he got it from" one of the officers on scene who had observed Antonio.

scene matched the gun found in the toilet tank, and was the same brand and type as some of the ammunition found in Delgado's apartment. The autopsy confirmed that Victim had not been shot at close range. And both officers who arrived on scene and saw Antonio standing over Victim testified that Antonio had no gun, a fact corroborated by the surveillance video from the camera across the street.

¶32    For these reasons, we conclude that Delgado cannot demonstrate a reasonable likelihood of a different outcome at trial had Attesting Detective been present at trial and testified. Therefore, Delgado's first claim of ineffective assistance of counsel fails because Delgado has not demonstrated prejudice.

II

¶33    Second, Delgado claims that his trial attorneys rendered ineffective assistance by failing to object, pursuant to rule 702 of the Utah Rules of Evidence, to the admission of the State's fingerprint evidence. In particular, Delgado asserts that the State's fingerprint evidence was unreliable because the underlying analysis was not conducted with blind verification. The State counters by asserting, among other arguments, that, even if the fingerprint evidence had been excluded, the outcome of the trial was not reasonably likely to have been different. We agree with the State.

¶34    We take Delgado's point that fingerprint evidence can sometimes be powerful evidence, and, in some cases, even a single fingerprint can be sufficient to convict a person of a crime. *See, e.g.*, *Howard v. State*, 695 S.W.2d 375, 376 (Ark. 1985) (stating that "fingerprint identification alone is sufficient evidence to sustain the conviction"). But in this case, the chief value to the State of the fingerprint evidence was to tie Delgado to the murder weapon, and to provide evidence that it was Delgado—rather than someone else—who hid the gun in the toilet tank.

And on those points, the State's evidence was strong, and certainly not dependent upon the fingerprint evidence.

¶35    As noted above, the evidence linking Delgado to the murder weapon was overwhelming. Two witnesses saw Delgado in possession of the same weapon during the relevant time period, and one of those witnesses (Ronald) saw him with it both immediately before and immediately after the shooting. Ammunition located inside Delgado's apartment matched both the spent shell casing found near the door to the apartment building, as well as the cartridge found inside the gun. The best evidence indicating that someone else—Antonio—had a gun during the relevant period was the language of the search warrant affidavits, and that evidence was countered by eyewitness testimony from the two officers who arrived first on scene, and by the surveillance video footage. Thus, even without the fingerprint evidence, we are persuaded that the jury nevertheless would have concluded that Delgado was in possession of the gun during the relevant time period.

¶36    Similarly, the evidence indicating that Delgado—rather than someone else—hid the gun in Ronald's toilet tank was strong, even excluding the fingerprint evidence.[5] Ronald saw Delgado with the gun moments after the shooting; Antonio saw Delgado without the gun, in Antonio's apartment, just a few minutes later. During that encounter, Delgado admitted to Antonio that "he had hid[den] [the gun] and not to worry about it." In addition, immediately prior to the shooting, Delgado had

_____

5. It is unclear whether Delgado is even appealing his conviction for obstruction of justice. As noted, during closing argument he appeared to nearly acknowledge guilt on that count, and the State, in its brief on appeal, stated that "Delgado appears to contest his murder conviction only," a perception Delgado made no attempt to refute in his reply brief.

just been in Ronald's apartment smoking meth, and in the haste associated with the developing fight between Antonio and Victim, Ronald left the door to his apartment unlocked.

¶37 On this record, we are unconvinced that the outcome of the trial was reasonably likely to have been different, even in the absence of the fingerprint evidence. Accordingly, Delgado's second claim for ineffective assistance fails on the same ground as his first: because Delgado has not demonstrated prejudice.[6]

CONCLUSION

¶38 Delgado has not carried his burden of demonstrating that his trial attorneys rendered constitutionally ineffective assistance. Accordingly, we affirm Delgado's convictions.

_____

---

6. Because we resolve Delgado's second claim on prejudice grounds, we need not consider whether his attorneys performed deficiently by failing to lodge a rule 702 objection to the admission of the fingerprint evidence. But we have our doubts about that part of Delgado's claim too, given the apparent strength of the State's argument that a reasonable attorney in this case could have decided to forego a likely-futile motion and opt instead to concentrate on a vigorous cross-examination. Delgado cites no case in which a court has ruled fingerprint testimony inadmissible for lack of blind verification, and neither the literature cited in the briefs nor the testimony from the witnesses at trial indicates the existence of a scientific consensus, at the time the relevant fingerprint analysis was conducted, regarding the necessity of blind verification.