**2026 UT App 22**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL MANUEL CHACON,
Appellant.

Opinion
No. 20240150-CA
Filed February 12, 2026

Seventh District Court, Moab Department
The Honorable Don M. Torgerson
No. 231700035

Dylan T. Carlson, Debra M. Nelson, Benjamin Miller,
and Wendy M. Brown, Attorneys for Appellant

Derek E. Brown and Michael Gadd,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER
and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      A jury convicted Michael Manuel Chacon of failure to respond to a police officer's signal to stop. Chacon appeals his conviction, arguing that the evidence was insufficient to support it and that his trial attorney rendered constitutionally ineffective assistance by failing to object to certain aspects of the jury instructions. For the reasons that follow, we reject Chacon's arguments and affirm his conviction.

BACKGROUND[1]

*The Incident*

¶2 Late one evening, Chacon borrowed a pickup truck owned by a friend (Friend)—Chacon was living with Friend at the time—and drove to a convenience store to purchase gas and groceries. A police officer (Officer) noticed that the truck Chacon was driving had a damaged taillight. After Chacon completed his purchases and returned to the truck, he drove out of the store's parking lot and headed back toward Friend's house. Officer followed him without initially attempting to stop him.

¶3 Chacon recognized that he was being followed, and he pulled over to the side of the road to allow Officer to pass. When Officer passed, Chacon pulled out behind Officer. Confused by this, Officer then pulled over to the side of the road to let Chacon pass, but instead of passing, Chacon pulled over behind Officer, and Officer and Chacon sat there in their vehicles for about "five to eight minutes." Eventually, Officer "start[ed] to feel unsafe" and pulled back onto the road and made a right turn. Chacon followed, pulling out behind Officer and making the same right turn. More concerned now, Officer pulled into a nearby grocery store parking lot and turned on her emergency lights. After Chacon passed, Officer pulled out of the parking lot and got behind Chacon to "initiate a traffic stop." At this point, Officer's emergency lights and sirens were on to "alert [Chacon] that [she was] attempting to initiate a traffic stop."

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

¶4      Chacon did not pull over right away. He was not driving fast, and he appeared to be obeying traffic laws, but he did not pull over in response to Officer's lights and sirens. After about three minutes of slow pursuit, Officer called for backup. A couple of minutes later, two additional officers in separate vehicles arrived, both with their lights and sirens on. Officer radioed the more experienced backup officer (Backup Officer) and asked him to take the lead because Officer "had a [civilian] ride-along with [her] that night and [she] did not want to put [that person] in jeopardy." Backup Officer then replaced Officer as the vehicle closest to Chacon, and Chacon soon pulled into Friend's driveway and stopped the truck. From the time Officer pulled out of the grocery store parking lot with her lights and sirens on until Chacon stopped his vehicle, "about six minutes" had elapsed and Chacon had driven "[a]pproximately two miles," through mostly residential city streets that were largely devoid of other traffic.

¶5      At Friend's house, Backup Officer "positioned [his] car so [he] could stay behind [the] front pillar [of the] cab [of the police vehicle], just in case the person that was fleeing—or not stopping—came out with a gun to shoot at [him]." Backup Officer drew his firearm and shouted commands at Chacon, indicating that he wanted to place Chacon under arrest. Chacon complied with these commands. During the arrest, Chacon told Backup Officer that he felt like he had to bring the truck back to Friend's house because, as he described it, Friend was not someone anyone would want to mess with.

*The Trial*

¶6      Later, the State charged Chacon with failure to respond to an officer's signal to stop, a third-degree felony, and the case proceeded to trial. During the trial, Officer and Backup Officer testified for the State, and they related the facts outlined above. Their testimony was accompanied by video evidence from Officer's dashcam and Backup Officer's bodycam.

¶7    Following the State's presentation of evidence, Chacon's counsel (Counsel) moved for a directed verdict, arguing that there was "insufficient evidence to sustain the count as alleged." The State responded, arguing that it had met its burden by identifying Chacon as the operator of the vehicle, showing that the officers tried to conduct a traffic stop, and showing that Chacon drove for two miles before finally stopping. The court denied Counsel's motion, concluding that there was "sufficient evidence that would sustain a conviction if the jury decide[d] to convict."

¶8    Chacon then testified in his own defense. He told the jury that initially, when Officer was driving behind him, Officer "had [her] brights on to where [Chacon] couldn't even see to drive," so he pulled over to "adjust [his] mirrors so [he could] operate [his] vehicle safely." He also thought that "if [he was] in trouble, [Officer would have] initiate[d] a traffic stop at that point." After Officer drove past him, he "figured there[] [was] nothing wrong" and "pull[ed] . . . back out onto the road to try and continue home." When he caught up to Officer, he claimed she was "driving five under the speed limit." As Officer pulled over in front of Chacon, he "pulled right behind," assuming that if Officer thought there was "something wrong with [Chacon's] vehicle, [Officer would] come out and tell [him]." After sitting there for a few minutes, Chacon decided he "was not going to approach" Officer's vehicle, because he didn't want Officer "to feel like [he was] trying to attack her or anything."

¶9    Continuing with his testimony, Chacon stated that after he pulled out behind Officer, Officer turned on her "red and blues" before doing a three-point turn in front of Chacon to drive the opposite way. He testified that he had thought, "[S]weet, [Officer]'s got another call; she's going to leave me alone and stop harassing me." Officer then "pull[ed] into [a grocery store] parking lot" without "initiat[ing] anything." At that point, Chacon was "turning super slow" and just "watching" Officer, wondering what Officer was doing. Chacon acknowledged that,

at this point, Officer pulled back onto the road behind Chacon with her lights and sirens on. Chacon explained that he decided not to pull over because he "was scared," not because he thought Officer would physically harm him but because he felt like local police officers in general—and one officer in particular—had been "intimidating and bullying" him. He stated that he'd had a previous experience in which a different officer had harassed him by "follow[ing him] around and stop[ping him] for whatever he [could] stop [him] for and question[ing him] on everything under the sun." He testified that he did not stop his vehicle until he got to Friend's house because that is where he felt safe.

¶10 Chacon testified that he would've pulled over at the grocery store parking lot, when Officer originally turned on her lights, but "at that point, [he] didn't know what in the hell [Officer] was doing." After that, he said he was too scared and "just wanted to get home where [he] felt safe." He testified that he "was always under the assumption you can drive to where you feel safe, either a parking lot that's lit with people in it, or you [can] go home." He acknowledged that, while the officers were following him with their lights on, he had passed several well-lit areas, including one near a different friend's house where he felt safe, but that he didn't stop at those places. He also didn't pull over in some of the other residential areas he drove through "[b]ecause [he didn't] know" the people who lived there and because he "just wanted to go home where [he] felt safe."

*The Jury Instructions*

¶11 The State and Counsel proposed competing jury instructions on the elements of the charged offense. The only difference between the two instructions was that the State's proposed instruction had some additional language about the jury's obligation to find Chacon guilty or not guilty. Counsel stipulated to adopting the State's proposed instruction, which stated in relevant part as follows:

[Chacon] is charged with failure to respond to officer's signal to stop on or about December 26th, 2022, in Grand County, Utah. You cannot convict him of this offense unless, based on the evidence, you find beyond a reasonable doubt each of the following elements:

1. [Chacon];

2. As an operator who received a visual or audible signal from a peace officer to bring the vehicle to a stop;

3. Attempted to flee or elude a peace officer by vehicle or other means.

As discussed below, this instruction did not inform the jury which mental state—e.g., intentionally, knowingly, or recklessly—Chacon needed to have in order to be convicted of the charged offense. In a separate instruction, however, the court gave the jury definitions of "intentionally," "knowingly," and "recklessly."

¶12 After deliberation, the jury found Chacon guilty of the charged offense.

ISSUES AND STANDARDS OF REVIEW

¶13 Chacon now appeals, and he asks us to consider two issues. First, he challenges the court's ruling denying his directed verdict motion. "We review [a trial] court's denial of a motion for directed verdict for correctness." *State v. Graydon*, 2023 UT App 4, ¶ 26, 524 P.3d 1034 (cleaned up). And "when a defendant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, . . . we will uphold the [trial] court's denial if, when viewed in the light most favorable to the State, some

evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *Id.* (cleaned up).

¶14 Second, Chacon argues that Counsel rendered constitutionally ineffective assistance by failing to object to the elements jury instruction, which contained no provision regarding the required mental state. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (cleaned up).

## ANALYSIS

### I. Sufficiency of the Evidence

¶15 First, Chacon challenges the trial court's ruling denying his motion for a directed verdict. Specifically, he argues that there was insufficient evidence to support the conviction. We disagree, and on that basis we conclude that the trial court did not commit error in denying Chacon's motion.[2]

¶16 "A directed verdict is warranted only when, viewed in the light most favorable to the State, no evidence exists from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime." *State v. Pola*, 2025 UT App 143, ¶ 35, 579 P.3d 407 (cleaned up), *cert. denied*, 581 P.3d 560 (Utah 2025). "But if there is any evidence, however slight or

---

2. The State asserts that Chacon's sufficiency challenge is unpreserved. However, we can easily resolve this issue on the merits in favor of the State, and we choose to take that route here. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

circumstantial, which tends to show guilt of the crime charged, the court must submit the case to the jury." *Id.* (cleaned up).

¶17 In order to convict Chacon of the charged crime, the State had to prove that Chacon was an "operator" of a vehicle who had "receive[d] a visual or audible signal from a law enforcement officer to bring the vehicle to a stop" and had made an "attempt to flee or elude a law enforcement officer." *See* Utah Code § 41-6a-210(1)(a) (2022). In his argument on appeal, Chacon focuses entirely on the last element. That is, he acknowledges that he was an operator of a vehicle and that "[t]he evidence . . . supports the jury's determination that [he] 'receive[d] a visual or audible signal from a law enforcement officer to bring the vehicle to a stop,'" but he asserts that the evidence "does not . . . support a finding that [he] . . . intend[ed] 'to flee or elude a law enforcement officer.'" (Quoting *id.*)

¶18 The governing statute, as codified at the time of Chacon's arrest, did not specify which mental state was required for conviction.[3] But prior to Chacon's arrest, our supreme court had concluded that in order to win a conviction on this charge, the State had to prove that the defendant had *knowledge* of a "visible or audible signal from a [law enforcement] officer" and that the defendant *intentionally* "attempt[ed] to flee or elude" the officer. *See State v. Bird*, 2015 UT 7, ¶¶ 23–24, 26, 345 P.3d 1141. Thus, under precedent in effect at the time, the State had to prove that Chacon knew that Officer gave him a signal to stop and that—

_____

3. In 2024, our legislature amended the statute to add a specific mental state requirement. *See* Towing Requirements, ch. 134, § 1, 2024 Utah Laws 1079, 1079. As currently worded, the statute now expressly requires the State to show that the defendant "knowingly or intentionally attempt[ed] to flee or elude a law enforcement officer." *See* Utah Code § 41-6a-210(1)(a)(ii).

after receiving that signal from Officer—Chacon intentionally attempted to flee or elude the officers.

¶19 To support the contested second element—that Chacon *intentionally* attempted to flee or elude law enforcement—the State at trial pointed to Chacon's own admission that, due to negative experiences with another officer, he was too scared to pull over and that he "just wanted to go home where [he] felt safe." The State also pointed to Chacon's admission that he felt like he had to bring the truck back to Friend's house because, as he described it, Friend was not someone anyone would want to mess with. In the State's view, a jury considering these facts could reasonably have concluded that Chacon intended to try to flee or elude the officers.

¶20 In response, Chacon does not contest the fact that his actions were intentional, but he argues that his motivation was not to flee or elude the officers but, instead, to simply find somewhere safe to pull over and to get the truck back to its owner. He acknowledges our supreme court's statement that "fleeing or eluding" means attempting to "escape or *avoid*" a police officer, *see id.* ¶ 23 (emphasis added), but he asserts that "[t]he six-minute delay in his stop was based on location and safety, not avoidance." And he points to our supreme court's statement in *Bird* that attempting to "flee or elude means something more than to merely leave or depart; the terms indicate action with a specific purpose." *Id.* In particular, he argues that "[a] person does not [attempt to] flee or elude an officer who he plans to yield to momentarily." We take Chacon's point that not all motorists who do not immediately pull over upon receipt of an officer's signal intend to flee or elude officers. For instance, in some situations, traffic conditions might prevent a motorist from safely pulling over immediately after being signaled; motorists who wait to pull over until they reach a traffic-safe area have a very good argument that they did not intend to attempt to flee or elude officers. Indeed, depending on the specific circumstances, a factfinder might

reasonably conclude that a motorist who didn't feel safe pulling over immediately, even for non-traffic-related reasons, did not intend to flee or elude officers.

¶21   But debates regarding a defendant's intent or motives present classic jury questions. *See State v. Holden*, 964 P.2d 318, 324 (Utah Ct. App. 1998) (describing a determination regarding intent as "the quintessential factual question" (cleaned up)). Under the governing statute, a defendant who tries to "escape or avoid" an officer, even temporarily, may—depending on the circumstances—be found to have intended to attempt to flee or elude that officer. *See Bird*, 2015 UT 7, ¶ 23 ("Although a person might act recklessly by *departing* from a police stop without the police officer's permission, the person would not be *fleeing* unless it were [the person's] intention to <u>escape or avoid</u> the police officer. To attempt to flee or elude, therefore, requires that the actor leave in an effort to <u>escape or avoid</u> a peace officer." (underscoring added)). And on this record, there was enough evidence to support the jury's determination that Chacon intended to try to avoid—and thereby flee or elude—the officers.

¶22   Here, Chacon did not pull over as soon as he was aware of Officer's signal to stop. Traffic safety was not a concern, because the roads on which he was traveling were largely residential and devoid of other traffic. And he did not pull over into any one of several well-lit public areas, such as parking lots, even after Officer called for backup and multiple officers were on the scene. He even passed one well-lit lot that was near a different friend's house, and he continued driving for a total of about six minutes, covering some two miles, before finally coming to a stop at the place where he lived with Friend. He also acknowledged being at least partially motivated by fear of reprisal from Friend, the truck's owner, whom Chacon described as someone a person would not want to mess with. While a jury could conceivably have come to the opposite conclusion on these facts, we cannot say that the conclusion it did reach—that Chacon intentionally

attempted to avoid, and thereby flee or elude, the officers—was unsupported by some competent evidence.

¶23 Accordingly, the trial court did not err in denying Chacon's directed verdict motion.

## II. Ineffective Assistance of Counsel

¶24 Next, we turn to Chacon's claim that Counsel rendered ineffective assistance by not objecting to the jury instruction containing the elements of the charged offense.[4] While we agree with Chacon that the elements instruction was infirm, we ultimately reject Chacon's ineffective assistance claim on prejudice grounds.

¶25 A defendant seeking to show that his attorney rendered ineffective assistance must make a two-part showing: that (1) the attorney's performance was deficient and (2) this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The first part of this analysis involves an assessment of the objective reasonableness of counsel's actions, *see State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350, and "requires [a] showing . . . that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland*, 466 U.S. at 687. And the second part requires a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In this second inquiry, the crucial question is whether

---

4. Chacon makes no claim that Counsel rendered ineffective assistance in any other way. In particular, he does not assert that Counsel rendered ineffective assistance by electing not to seek a jury instruction regarding any potential lesser-included offense.

"the outcome of [the defendant's] case would have been different absent counsel's error." *Scott*, 2020 UT 13, ¶ 43.

¶26    But in cases where a defendant claims that the attorney rendered ineffective assistance by failing to object to jury instructions, there is a threshold question whose answer will inform the two-step *Strickland* analysis: in such cases "we must first consider whether [the jury] instructions [at issue] were legally correct." *State v. Liti*, 2015 UT App 186, ¶ 12, 355 P.3d 1078. This is because "failure to object to jury instructions that correctly state the law is not deficient performance," *State v. Vigil*, 2019 UT App 131, ¶ 11, 448 P.3d 738 (cleaned up), and cannot, by definition, lead to prejudice, *see State v. Von Niederhausern*, 2018 UT App 149, ¶¶ 29–30, 427 P.3d 1277 (holding that "where [a] [d]efendant fails to identify, let alone argue, what would have been the legally correct version of the instruction," the "[d]efendant also fails to show prejudice since an objection to the jury instructions would have surely been unsuccessful"). Accordingly, we first assess the correctness of the jury instruction that Chacon challenges.

## A.    The Challenged Instruction

¶27    When examining jury instructions, we review them "in their entirety to determine whether the instructions, taken as a whole, fairly instructed the jury about the applicable law." *Liti*, 2015 UT App 186, ¶ 12. In this case, as in most cases, the logical place to begin our analysis is with the statutory requirements of the charged crime. *See id*. ¶ 13.

¶28    As already noted, *see supra* ¶ 17, the State had to prove two basic elements in order to convict Chacon of failure to respond to an officer's signal to stop. First, the State had to show that Chacon was an "operator" of a vehicle "who receive[d] a visual or audible signal from a law enforcement officer to bring the vehicle to a stop." *See* Utah Code § 41-6a-210(1)(a) (2022). Second, the State had to show that Chacon did so while "attempt[ing] to flee or

elude a law enforcement officer." *Id.* The governing statute—at least as it was worded at the time—did not contain an express mental state requirement. *See id.* But as also already noted, *see supra* ¶ 18, our supreme court had clearly held that, in order to win a conviction for this offense, the State needed to prove that the defendant had *knowledge* of a "visual or audible signal from a [law enforcement] officer" and that the defendant *intentionally* "attempt[ed] to flee or elude" the officer. *State v. Bird*, 2015 UT 7, ¶¶ 23–24, 26, 345 P.3d 1141. In that same case, the court also determined that an elements instruction that did not contain these mental state specifications was infirm. *Id.* ¶¶ 23–24.

¶29    In the instant case, the relevant jury instruction—quoted in its entirety above, *see supra* ¶ 11—did not contain the necessary mental state specifications. Under precedent from our supreme court that was in effect at the time the instruction was given, the absence of these specifications rendered the instruction infirm. The State does not disagree, stating in its brief that "[n]o one should feel proud of the elements instruction given in this case."

B.     Deficient Performance and Prejudice

¶30    Because the challenged instruction is infirm, we must proceed to consider whether Counsel's decision not to object to that instruction constituted ineffective assistance. For purposes of our analysis, we will assume—without deciding—that Counsel's decision constituted deficient performance. But to prevail on his ineffective assistance claim, Chacon must make an adequate showing on both prongs, *see State v. Delgado*, 2020 UT App 121, ¶ 25, 473 P.3d 234, and in this case we conclude, for the reasons discussed below, that Chacon cannot show prejudice. Thus, we need not consider whether Counsel's performance was deficient, because even if it was, Chacon still cannot demonstrate that Counsel rendered ineffective assistance. *See id.* ("It is unnecessary to address both components of the inquiry if we determine that [a defendant] has made an insufficient showing on one." (cleaned

up)); *see also State v. Roberts*, 2019 UT App 9, ¶ 23, 438 P.3d 885 ("In practice, we often skip the question of deficient performance when a defendant cannot show prejudice.").

¶31 "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up). "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86.

¶32 We must therefore envision a hypothetical trial in which jurors received a correct instruction—telling them that Chacon needed to have *intentionally* attempted to flee or elude law enforcement—but in which the rest of the proceedings went off identically. And in considering that hypothetical trial, we must ask whether we think it is reasonably probable that the jury would have reached a different outcome. Under the circumstances presented here, a different outcome in that hypothetical trial is not reasonably probable.

¶33 We acknowledge that our supreme court, in *Bird*, held that the term "attempt," as used in general parlance and in at least one other statute, "does not necessarily indicate the applicable level of mens rea" and that, for this reason, an elements instruction regarding attempt crimes that does not contain a mens rea provision may be infirm. *See* 2015 UT 7, ¶¶ 22–24. But the majority

in that case acknowledged that the term "attempt," as used in the statute at hand, "implicates an intentional mens rea," *id.* ¶ 23, and for reasons unique to that appeal, the majority did not reach the question of whether the error at issue—offering the jury an elements instruction without a mental state provision—was harmless on the facts presented. Justice Lee dissented in *Bird* and agreed with the majority that the term "attempt," as used in the relevant statute, connotes intentional action, but—unlike the majority—he went on to reach the harmlessness question. *See id.* ¶¶ 32–39 (Lee, J., dissenting). And on that point, he offered the view that, even if there were "some minor, unarticulated distinction between the ordinary meaning of . . . 'attempt[ing] to flee or elude a peace officer'" and the ordinary meaning of "intent," the infirmity in the jury instruction was harmless. *Id.* ¶¶ 32–33, 39. We find Justice Lee's position on prejudice persuasive, especially as applied to the facts at hand.

¶34 At trial in this case, the dispute was never really about whether Chacon's actions were intentional. That is, Chacon never asserted that his actions were taken knowingly, recklessly, or negligently. To the contrary, he acknowledged that he intentionally did not pull over, asserting that he was "scared," given his previous interactions with another officer who Chacon believed had "follow[ed him] around and stop[ped him] for whatever he [could] stop [him] for and question[ed him] on everything under the sun." And while Chacon was not afraid for his physical safety, he was afraid of the officers "intimidating and bullying" him. Accordingly, he waited to pull over until he arrived at a location where he felt safe. In addition, he asserted that he was motivated by the desire to get the borrowed truck back to Friend, whose reprisal he feared if the truck were not returned safely. Thus, Chacon described entirely intentional actions, and he never argued that his actions were taken with a less-culpable mental state. *Compare State v. Simpson*, 904 P.2d 709, 714 (Utah Ct. App. 1995) (describing a defendant, charged with "eluding a peace officer," who defended himself by asserting that

he "might have frozen at the wheel" due to "shock" "when he saw the officers' flashing lights").

¶35 Instead, the dispute—as framed for the jury—was what Chacon's precise motivation was. Were his intentional actions motivated by a desire to avoid, and thereby flee or elude, the officers? Or were those actions motivated merely by a desire to find a safe place to pull over? Either way, the actions were framed as intentional ones; Chacon knew he was being stopped and chose not to pull over, at least not for six minutes. The jury was not operating under any illusion that Chacon's actions were anything but intentional.

¶36 The elements instruction—even in its infirm mental-state-free condition—told the jury that it had to consider whether Chacon had "attempted to flee or elude" the officers. Indeed, that was the focal point of the dispute between the parties. What the instruction was missing was the clarification that Chacon's actions, in attempting to flee or elude the officers, must have been intentional. But on the particular facts presented here, adding the specific intent requirement would not have been reasonably likely to have made a difference, because—regardless of what his specific motivations were—Chacon acted intentionally. Even had the specific intent requirement been included, the jury still would have needed to grapple with the broader question of what Chacon's motivation was for his intentional actions: was it to flee or elude the officers, or was it just to try to find a safe place to pull over? And on that question, we know what the jury decided.

¶37 In particular, we consider it highly unlikely—given (a) the ordinary meaning of the word "attempt," as used in this context, (b) Chacon's tacit acknowledgment that his actions were intentional, and (c) the evidence in the case indicating that Chacon was not only attempting to avoid at least one particular officer but that he was also motivated by fear of reprisal from Friend—that any juror would have concluded that Chacon only *knowingly* (and

not *intentionally*) attempted to avoid, and thereby flee or elude, the officers. On this record, our confidence in the outcome of the trial is simply not undermined, and on that basis we conclude that Chacon was not prejudiced by the jury instruction's infirmity.

¶38    We certainly do not endorse the elements instruction given here. It was contrary to governing case law, and it should have been more explicit about the mental state required for conviction. But on the facts presented here, Chacon has not demonstrated that any deficient performance by Counsel in not objecting to the elements instruction prejudiced him, and on that basis we reject Chacon's claim of ineffective assistance.

## CONCLUSION

¶39    The trial court did not err in denying Chacon's motion for a directed verdict. And Chacon has not carried his burden of demonstrating that Counsel rendered ineffective assistance by not objecting to the elements instruction.

¶40    Affirmed.

─────────